# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 13, 2016          Decided August 18, 2017

No. 13-3061

UNITED STATES OF AMERICA,
APPELLEE

v.

EZRA GRIFFITH,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cr-00013-1)

*William H. Burgess* argued the cause for appellant. With him on the briefs were *Darren S. Gardner*, *A.J. Kramer*, Federal Public Defender, and *Rosanna M. Taormina*, Assistant Federal Public Defender. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Lauren R. Bates*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Elizabeth Trosman* and *Chrisellen R. Kolb*, Assistant U.S. Attorneys.

Before: BROWN, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Dissenting opinion filed by *Circuit Judge* BROWN.

SRINIVASAN, *Circuit Judge*: Most of us nowadays carry a cell phone. And our phones frequently contain information chronicling our daily lives—where we go, whom we see, what we say to our friends, and the like. When a person is suspected of a crime, his phone thus can serve as a fruitful source of evidence, especially if he committed the offense in concert with others with whom he might communicate about it. Does this mean that, whenever officers have reason to suspect a person of involvement in a crime, they have probable cause to search his home for cell phones because he might own one and it might contain relevant evidence? That, in essence, is the central issue raised by this case.

Appellant Ezra Griffith was charged with unlawful possession of a firearm by a convicted felon. He moved to suppress the firearm, arguing that police discovered it while executing an invalid warrant to search his home. The district court denied the motion, and a jury convicted Griffith at trial. Griffith now challenges the denial of his motion to suppress.

The warrant authorized officers to search for and seize all cell phones and other electronic devices in Griffith's residence. The supporting affidavit, however, offered almost no reason to suspect that Griffith in fact owned a cell phone, or that any phone or other device containing incriminating information would be found in his apartment. In our view, the fact that most people now carry a cell phone was not enough to justify an intrusive search of a place lying at the center of the Fourth Amendment's protections—a home—for any phone Griffith might own.

We therefore agree with Griffith that the warrant to search his residence was unsupported by probable cause. We also

reject the government's arguments that, even if the warrant was invalid, the firearm still need not have been excluded from the evidence against him. Consequently, we vacate Griffith's conviction.

I.

In January 2013, police obtained a warrant to search Griffith's residence in connection with their investigation of a homicide committed more than one year earlier. Investigators concluded that the shooting related to a conflict between rival gangs. The officers knew Griffith was a member of one of the gangs and suspected he drove the getaway car, which surveillance footage had captured circling the scene. Two months after the shooting, police found a vehicle matching the surveillance footage and registered to Griffith's mother. Eight months later, a detective met with Griffith's mother, who confirmed that Griffith had been the vehicle's principal user.

During much of the year-long investigation, Griffith had been incarcerated on unrelated charges. Detectives obtained recordings of Griffith's jailhouse phone calls made on the day they interviewed his mother. Griffith initiated four calls that day: two to his home number (where his mother lived) and two to his grandmother's home phone. In one of the calls, Griffith spoke to Dwayne Hilton, another suspect in the shooting, and said, "man you know it's about that." A. 33. The two briefly discussed a "whip" (slang for car), before Hilton changed the subject. *Id.* In another call, Griffith's brother reported that fellow gang member Carl Oliphant needed to speak with Griffith. Oliphant did not have a cell phone, so Griffith's brother walked with a phone to Oliphant's house. Griffith then briefly explained to Oliphant that detectives had been investigating the car.

In September 2012, Griffith was released from his confinement on the unrelated charges after serving approximately 10 months. Detectives learned that Griffith moved into an apartment owned by his girlfriend, Sheree Lewis. In January 2013, police sought a warrant to search Lewis's apartment.

The bulk of the ten-page affidavit supporting the search warrant explained Griffith's suspected involvement in the homicide committed more than one year beforehand. The affiant, a 22-year veteran of the police department, recounted the evidence and expressed his belief that Griffith had been the getaway driver. The affidavit also described the evidence that Griffith now lived with Lewis in her apartment.

Two sentences in the affidavit then set out the basis for believing incriminating evidence would be discovered in the apartment. Those sentences read as follows:

> Based upon your affiant's professional training and experience and your affiant's work with other veteran police officers and detectives, I know that gang/crew members involved in criminal activity maintain regular contact with each other, even when they are arrested or incarcerated, and that they often stay advised and share intelligence about their activities through cell phones and other electronic communication devices and the Internet, to include Facebook, Twitter and E-mail accounts.

> Based upon the aforementioned facts and circumstances, and your affiant's experience and training, there is probable cause to believe

that secreted inside of [Lewis's apartment] is evidence relating to the homicide discussed above.

A. 35-36. The affidavit then concluded by enumerating the items the officers sought to seize from the apartment, principally any cell phones and electronic devices found there.

On January 4, 2013, a magistrate judge granted the application for a search warrant. As requested in the affidavit, the warrant authorized a search for, and seizure of, the following items:

all electronic devices to include, but not limited to cellular telephone(s), computer(s), electronic tablet(s), devices capable of storing digital images (to include, but not limited to, PDAs, CDs, DVD's [and] jump/zip drives), evidence of ownership of such devices, subscriber information relating to the electronic devices, any information describing, referencing, or mentioning in any[ ]way the above-described offense, any handwritten form (such as writing to include but not limited to notes, papers, or mail matter), photographs, newspaper articles relating to the shooting death [under investigation], and any indicia of occupancy of the premises described above.

A. 26.

Three days later, on January 7, a team of officers executed the search. The officers arrived at 7:10 AM and surrounded the building. When they knocked on the door and announced they had a search warrant, an officer assigned to contain the

premises observed an arm throw an object out of the apartment's window. The officer determined that the object was a firearm and then glanced at the window. He saw Griffith looking back at him.

About 30 seconds after the officers knocked on the door and announced they had a search warrant, Lewis opened the door. Officers found three people inside the apartment: Lewis, Griffith, and a six-year-old child. Officers knew one of those three people had tossed the gun out of the window. Officers seized the gun, and also seized a number of cell phones recovered in the course of their search of the apartment.

Based on the containment officer's identification of him, the government charged Griffith with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Griffith moved to suppress all tangible evidence seized under the search warrant, including the gun. He challenged the warrant as facially invalid, arguing there was no evidence he had ever owned a cell phone or other electronic device, or that any such device would be found in the apartment. The government argued that the warrant was supported by probable cause, or that, at a minimum, the good-faith exception to the exclusionary rule applied. *See United States v. Leon*, 468 U.S. 897 (1984). The government further contended that Griffith in any event lacked standing to seek suppression of the gun because he had voluntarily abandoned it when he tossed it out of the window.

The district court denied Griffith's suppression motion. The court rejected the government's abandonment argument because it thought the merits of the government's position on that issue would rise or fall with the legality of the government's "entry into the apartment that prompted the tossing of the gun." A. 110. The court also declined to decide

whether the warrant was supported by probable cause, holding that, regardless, the good-faith exception to the exclusionary rule applied.

At trial, a jury convicted Griffith of unlawful possession of a firearm by a felon. He appeals his conviction, challenging the district court's denial of his suppression motion.

## II.

We first consider the validity of the warrant authorizing the search of Lewis's apartment. Because Griffith lived with Lewis at the time, he had a legitimate expectation of privacy in her home for purposes of raising a Fourth Amendment challenge. *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990).

The government's argument in support of probable cause to search the apartment rests on the prospect of finding one specific item there: a cell phone owned by Griffith. Yet the affidavit supporting the warrant application provided virtually no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence. At the same time, the warrant authorized the wholesale seizure of all electronic devices discovered in the apartment, including items owned by third parties. In those circumstances, we conclude that the warrant was unsupported by probable cause and unduly broad in its reach.

## A.

The Fourth Amendment prescribes that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. When assessing whether a search warrant is supported by probable cause, we ask whether the issuing judge had a "substantial

basis" for concluding that "a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). Although we pay "great deference" to the judge's initial determination of probable cause, a warrant application cannot rely merely on "conclusory statement[s]." *Id.* at 236, 239 (citing *Nathanson v. United States*, 290 U.S. 41 (1933)).

Here, the lion's share of the affidavit supporting the warrant application is devoted to establishing Griffith's suspected involvement as the getaway driver in a homicide. That information might have established probable cause to arrest Griffith for his participation in the crime. The warrant application, though, was for a search warrant, not an arrest warrant. And to obtain a warrant to search for and seize a suspect's possessions or property, the government must do more than show probable cause to arrest him. The government failed to make the requisite showing in this case.

1. The Supreme Court has long distinguished between arrest warrants and search warrants. *See Steagald v. United States*, 451 U.S. 204, 212-13 (1981). An arrest warrant rests on probable cause to believe that the suspect committed an offense; it thus primarily serves to protect an individual's liberty interest against an unreasonable seizure of his person. *Id.* at 213. A search warrant, by contrast, is grounded in "probable cause to believe that the legitimate object of a search is located in a particular place." *Id.* Rather than protect an individual's person, a search warrant "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Id.*

In light of the distinctness of the inquiries, probable cause to arrest a person will not itself justify a warrant to search his property. Regardless of whether an individual is validly

suspected of committing a crime, an application for a search warrant concerning his property or possessions must demonstrate cause to believe that "evidence is likely to be found at the place to be searched." *Groh v. Ramirez*, 540 U.S. 551, 568 (2004). Moreover, "[t]here must, of course, be a nexus . . . between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967).

Those concerns about the distinct requirements for a search warrant are particularly salient in this case, for two reasons. First, the warrant application sought authorization to search a home, which stands at "the very core" of the Fourth Amendment's protections. *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see Groh*, 540 U.S. at 559. Second, the scope of a permissible search depends on the specific spaces in which the object of the search might be found. *See Maryland v. Garrison*, 480 U.S. 79, 84-85 (1987). Authorization to search for an item fitting in the palm of a hand, like a cell phone, thus can entail an intrusive inspection of all corners of a home. (And here, as explained below, officers sought and obtained authorization to continue their search until they found every cell phone and electronic device in the apartment.) This case, in short, involves the prospect of an especially invasive search of an especially protected place.

Although the warrant application sought authorization to search for items other than a cell phone, those additional items have no bearing on our assessment of probable cause to search the home. The application, for instance, encompassed the seizure of any documents, newspaper articles, photographs, or other information relating to the crime. The affiant, however, suggested no reason whatsoever to expect the presence of incriminating documents, newspaper articles, or photographs in the apartment. The affidavit in fact contained no mention of

those items apart from a final sentence summarily seeking authorization to seize any of them officers might happen to discover. The government thus understandably makes no argument that there was probable cause to search the apartment due to a belief that incriminating documents, articles, or photographs would be found there.

The application also referenced electronic devices apart from cell phones, including computers, tablets, and personal digital assistants. Again, though, the affidavit provided no reason to suppose that Griffith possessed any of those devices or that any would be found in the apartment. And although we give a "commonsense" rather than "hypertechnical" reading to a warrant application, *Gates*, 462 U.S. at 236 (internal quotation marks omitted), there is no commonsense reason simply to presume that individuals own a computer or tablet. Those sorts of devices do not approach cellphones in their ubiquity: whereas the Supreme Court, around the time of the warrant application in this case, observed that "more than 90% of American adults . . . own a cell phone," *Riley v. California*, 134 S. Ct. 2473, 2490 (2014), the same organization cited by the Court for that measure estimated the contemporaneous incidence of tablet ownership among adults at roughly 30% (2013), and of computer ownership at roughly 75% (2015), *see Technology Device Ownership: 2015*, Pew Research Center (Oct. 29, 2015), http://www.pewinternet.org/2015/10/29/technology-device-ownership-2015.

2. That brings us back to the warrant application's reliance on cell phones—in particular, on the possibility that Griffith owned a cell phone, and that his phone would be found in the home and would contain evidence of his suspected offense. With regard to his ownership of a cell phone, it is true that, as the Supreme Court recently said, cell phones are now "such a pervasive and insistent part of daily life that the proverbial

visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 134 S. Ct. at 2484. We do not doubt that most people today own a cell phone.

But the affidavit in this case conveyed no reason to think that Griffith, in particular, owned a cell phone. There was no observation of Griffith's using a cell phone, no information about anyone having received a cell phone call or text message from him, no record of officers recovering any cell phone in his possession at the time of his previous arrest (and confinement) on unrelated charges, and no indication otherwise of his ownership of a cell phone at any time. To the contrary, the circumstances suggested Griffith might have been less likely than others to own a phone around the time of the search: he had recently completed a ten-month period of confinement, during which he of course had no ongoing access to a cell phone; and at least one person in his circle—his potential co-conspirator, Carl Oliphant—was known not to have a cell phone.

We are aware of no case, and the government identifies none, in which police obtained authorization to search a suspect's home for a cell phone without any particularized information that he owned one. In the typical case, officers will have already come into possession of a suspect's phone after seizing it on his person incident to his arrest. *See, e.g.*, *id.* at 2480-82; *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015). Officers also might receive reliable indication of a suspect's possession of a cell phone. *See, e.g.*, *United States v. Mathis*, 767 F.3d 1264, 1269 (11th Cir. 2014); *United States v. Grupee*, 682 F.3d 143, 145-46 (1st Cir. 2012). There was no such information here about Griffith.

3. To justify a search of the apartment to seize any cell phone owned by Griffith, moreover, police needed reason to

think not only that he possessed a phone, but also that the device would be located in the home and would contain incriminating evidence about his suspected offense. With respect to the first of those additional considerations, the affidavit set out no reason to believe the phone was "likely to be found at the place to be searched." *See Groh*, 540 U.S. at 568. People ordinarily carry their cell phones with them wherever they go. A cell phone, after all, is nearly a "feature of human anatomy." *Riley*, 134 S. Ct. at 2484. "According to one poll" cited by the Supreme Court, "nearly three-quarters of smart phone users report being within five feet of their phones most of the time," leading the Court to describe persons "who own a cell phone" as "keep[ing] *on their person* a digital record of nearly every aspect of their lives." *Id.* at 2490 (emphasis added).

In that light, the assumption that most people own a cell phone would not automatically justify an open-ended warrant to search a home anytime officers seek a person's phone. Instead, such a search would rest on a second assumption: that the person (and his cell phone) would be home. When, as here, the police execute a warrant early in the morning, such an assumption might be fair, but it entails adding another layer of inference onto an already questionable probable cause calculus. And the warrant in any event gave officers authority to search Griffith's apartment for any cell phones without regard to his presence on the scene. Indeed, the police, not knowing whether Griffith owned a cell phone, sought and obtained authority to maintain their search until they found *all* cell phones in Lewis's apartment, so that they could later assess which (if any) belonged to Griffith.

The upshot is that the information in the warrant application might well have supported an arrest warrant for Griffith—which in turn presumably would have occasioned a

search of him incident to his arrest, and an ensuing seizure of any cell phone he owned in the most likely place to find it (on his person). *See id.* at 2486. But the government instead elected to seek license to conduct a full-scale search of his entire home based on the possibility that he owned a phone and that a phone found there might be his.

The government urges us to assume that a home might contain incriminating evidence based on decisions allowing a search of a residence for drugs. That context is markedly different. Our decisions have considered probable cause to suspect a person of involvement in drug trafficking as supporting probable cause to believe drugs will be found in his residence. *See United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014); *United States v. Cardoza*, 713 F.3d 656, 661 (D.C. Cir. 2013). But we have done so precisely because drug traffickers "rarely keep on their person or immediately about them their entire supply of drugs." *Washington*, 775 F.3d at 409. And "[f]or the vast majority of drug dealers, the most convenient location to secure items is the home." *Cardoza*, 713 F.3d at 661 (quoting *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008)). The same considerations do not apply to cell phones. Although a trafficker ordinarily would keep the bulk of his drugs away from his person and in the security of his home, a person typically would keep her cell phone with her.

4. Finally, even if we assume Griffith owned a phone and that his phone would be found in the apartment, what about the likelihood that the phone would contain incriminating evidence? Because a cell phone, unlike drugs or other contraband, is not inherently illegal, there must be reason to believe that a phone may contain evidence of the crime. On that score, the affidavit in this case stated only that, in the affiant's experience, gang members "maintain regular contact

14

with each other" and "often stay advised and share intelligence about their activities through cell phones and other electronic communication devices and the Internet." A. 35.

That assessment might have added force if officers had been investigating a more recent crime. Because the information on a cell phone can enable reconstruction of the "sum of an individual's private life," *Riley*, 134 S. Ct. at 2489, the police often might fairly infer that a suspect's phone contains evidence of recent criminal activity, *see id.* at 2492, perhaps especially when, as here, multiple perpetrators may have coordinated the crime. But by the time police sought the warrant in this case, more than a year had elapsed since the shooting.

We require the existence of probable cause "at the time that law enforcement applies for a warrant," such that "the freshness of the supporting evidence is critical." *Washington*, 775 F.3d at 408; *see also United States v. Grubbs*, 547 U.S. 90, 95 n.2 (2006). Insofar as Griffith might have used a cell phone to communicate with his associates around the time of the crime, the search of the apartment would be grounded in an assumption that he continued to possess the same phone more than one year later. In the intervening period, though, he had been confined for some ten months. What is more, even in the event that Griffith, after his release, recovered possession of the same phone he had owned at the time of the crime, he would have had ample opportunity to delete incriminating information from the device by the time of the search (which occurred more than four months after his release). He had every incentive to cleanse his phone, and also to refrain from adding any new incriminating information to it: he had become aware of the investigation of him by the time of his release.

In that light, the government gains little by relying on Griffith's making of calls to his associates on a recorded jail line upon learning of the investigation. Griffith's use of a landline phone when confined sheds minimal light on whether any cell phone he once owned would retain any incriminating information if recovered in a search of his post-release residence. Nor do Griffith's calls from jail indicate how he would communicate upon his release, when he could contact his associates, if at all, in person. The jailhouse calls also occurred in response to a specific triggering event—his learning of the investigation. And, even then, those calls took place several months before officers obtained and executed the search warrant.

As a general matter, the likelihood that incriminating evidence continues to exist in the place to be searched—taking into account "the opportunities those involved in the crime would have had to remove or destroy [incriminating] items"—is an important consideration when assessing the existence of probable cause. *See* 2 Wayne R. LaFave, *Search & Seizure* § 3.7(a) (5th ed. 2016). Here, that consideration weighs against justifying a search of Lewis's apartment on any expectation that it would yield a phone that belonged to Griffith and retained information about a crime he might have committed more than one year earlier (and for which he had long known he was a suspect).

In view of the limited likelihood that any cell phone discovered in the apartment would contain incriminating evidence of Griffith's suspected crime, the government's argument in favor of probable cause essentially falls back on our accepting the following proposition: because nearly everyone now carries a cell phone, and because a phone frequently contains all sorts of information about the owner's daily activities, a person's suspected involvement in a crime

ordinarily justifies searching her home for any cell phones, regardless of whether there is any indication that she in fact owns one. Finding the existence of probable cause in this case, therefore, would verge on authorizing a search of a person's home almost anytime there is probable cause to suspect her of a crime. We cannot accept that proposition.

We treat the home as the "first among equals" when it comes to the Fourth Amendment. *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). The general pervasiveness of cell phones affords an inadequate basis for eroding that core protection.

## B.

The lack of probable cause to search Lewis's apartment for any cell phone owned by Griffith itself renders the warrant invalid under the Fourth Amendment. But the warrant was also invalid for an additional reason: its overbreadth in allowing the seizure of all electronic devices found in the residence. The officers executing the warrant made good on that authorization, seizing six cell phones and one tablet computer.

1.  The Fourth Amendment requires that warrants "particularly describ[e]" the "things to be seized." U.S. Const. amend. IV. That condition "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Garrison*, 480 U.S. at 84. Consequently, a warrant with an "indiscriminate sweep" is "constitutionally intolerable." *Stanford v. Texas*, 379 U.S. 476, 486 (1965). We will hold a warrant invalid when "overly broad." *United States v. Maxwell*, 920 F.2d 1028, 1033-34 (D.C. Cir. 1990).

In obligating officers to describe the items to be seized with particularity, the Fourth Amendment prevents "the issu[ance] of warrants on loose, vague or doubtful bases of fact." *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931). In that way, "the requirement of particularity is closely tied to the requirement of probable cause." 2 LaFave, *Search & Seizure* § 4.6(a). When a warrant describes the objects of the search in unduly "general terms," it "raises the possibility that there does not exist a showing of probable cause to justify a search for them." *Id.* § 4.6(d).

The warrant in this case authorized police to search for and seize "all electronic devices to include but not limited to cellular telephone(s), computer(s), electronic tablet(s), devices capable of storing digital images (to include, but not limited to, PDAs, CDs, DVD's [and] jump/zip drives)." A. 36. The affidavit, as explained, failed to establish probable cause to suspect that any cell phones or other electronic devices belonging to Griffith and containing incriminating information would be found in the apartment. Yet the warrant did not stop with any devices owned by Griffith, which already would have gone too far. It broadly authorized seizure of *all* cell phones and electronic devices, without regard to ownership. That expansive sweep far outstripped the police's proffered justification for entering the home—viz., to recover any devices owned by Griffith.

Indeed, the terms of the warrant allowed officers unfettered access to any electronic device in the apartment even if police *knew* the device belonged to someone other than Griffith. He shared the apartment with Lewis, his girlfriend, and the warrant authorized police to search for and seize all of her electronic devices. For instance, if officers executing the warrant had seen Lewis using her cell phone in her apartment, the warrant would have authorized them to seize that phone.

Yet the police unsurprisingly offered no explanation of why Lewis's devices could have been appropriately seized.

The warrant's overbreadth is particularly notable because police sought to seize otherwise lawful objects: electronic devices. Courts have allowed more latitude in connection with searches for contraband items like "weapons [or] narcotics." *Stanford*, 379 U.S. at 486 (internal quotation marks omitted). But the understanding is different when police seize "innocuous" objects. *See Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). Those circumstances call for special "care to assure [the search is] conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.*; *see also* 2 LaFave, *Search & Seizure* § 4.6(d).

Of course, even with searches of lawful objects, we may allow a broader sweep when a reasonable investigation cannot produce a more particular description. *See Andresen*, 427 U.S. at 480 n.10. There may be circumstances in which police have probable cause to seize a phone, yet still lack specific information about the phone's make or model. For example, police might learn a suspect uses a phone through an informant, and thus have no ability to describe the specific characteristics of any phone belonging to him. In that sort of situation, we recognize that some innocuous devices would need to "be examined, at least cursorily," to determine their relevance to the investigation. *Id.* at 482 n.11.

But even then, it is no answer to confer a blanket authorization to search for and seize all electronic devices. The warrant must be tailored to the justifications for entering the home. In this case, the warrant should have limited the scope of permissible seizure to devices owned by Griffith, or devices linked to the shooting. The Department of Justice in fact encourages use of that sort of approach in certain situations.

*See* Office of Legal Educ., *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*, Crim. Div., Dep't of Justice 69-72 (2015), https://www.justice.gov/sites/default/files/criminal-ccips/lega cy/2015/01/14/ssmanual2009.pdf.

Such a warrant would have enabled police to sweep more broadly when executing the search, but would have disabled them from seizing devices plainly unrelated to the crime. Officers, for example, could have examined a device they initially thought might belong to Griffith, but they could not have seized the device if they became aware it belonged to Lewis. That sort of approach would "minimize[] unwarranted intrusions upon privacy." *Andresen*, 427 U.S. at 482 n.11.

2. The government does not deny that the warrant in this case would be invalid insofar as it authorized the seizure of all devices found in the apartment without regard to ownership. The government instead argues that, for various reasons, the warrant should be read more narrowly. We find those arguments unpersuasive.

For instance, the government submits that the warrant should be read in conjunction with the attached affidavit, which, in the government's view, would narrow the permissible scope of seizure to the shooting under investigation. We read warrants by reference to an affidavit, however, only if the issuing judge uses "explicit words on the warrant" indicating an intention to incorporate the affidavit's contents and "thereby limit [the warrant's] scope." *Maxwell*, 920 F.2d at 1032. Here, the warrant referenced the affidavit only in noting generally that the "[a]ffidavit, herewith attached, having been made before me by Detective Konstantinos S. Giannakoulias," provided "probable cause." A. 26. We have rejected similar statements as insufficient to demonstrate the

requisite intention to narrow a warrant's sweep by incorporating an affidavit. *See Maxwell*, 920 F.2d at 1032-33.

Nor does the government allay our concerns by suggesting it would have attempted to determine which of the seized devices in fact belonged to Griffith and would have sought a separate warrant to search the contents of those—and only those—devices. As an initial matter, the warrant, according to its terms, seemingly would have authorized police to search any electronic devices in the residence. At the federal level, Federal Rule of Criminal Procedure 41 provides that, "[u]nless otherwise specified," a warrant authorizing seizure of electronic storage media also "authorizes a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B). The warrant here included no express limitations on agents' authority to examine any electronic devices seized. To the extent the officers showed restraint when executing the search, "this restraint was imposed by the agents themselves, not by a judicial officer." *Groh*, 540 U.S. at 561 (internal quotation marks omitted).

In any event, our holding does not turn on whether the police had the power to *search* the devices' digital contents. The police lacked probable cause to *seize* all electronic devices in the home in the first place. The warrant was invalidly overbroad in enabling officers to do so.

Finally, the government raises a procedural objection concerning whether Griffith properly preserved a challenge to the warrant's particularity before the district court. We find no merit in the government's objection. Griffith's overbreadth argument is simply an extension of his probable cause challenge, which he has pressed all along. He does not claim that the warrant failed to list the particular items police would seize. Instead, he claims that the warrant was overbroad in

authorizing "seizure of theoretical electronic devices that belonged to people who were unrelated to the warrant's justifications." Appellant Reply Br. 19. That is a species of the same legal theory he urged before the district court: the police lacked probable cause to seize all electronic devices in the residence. *See United States v. Peyton*, 745 F.3d 546, 551-52 (D.C. Cir. 2014). We agree, and hold the warrant was constitutionally invalid for that reason.

## III.

The invalidity of the search warrant would not necessarily require excluding evidence recovered in its execution. Under the good-faith exception to the exclusionary rule, "evidence seized in reasonable, good-faith reliance on a search warrant" need not be excluded, even if the warrant turns out to have been unsupported by probable cause. *Leon*, 468 U.S. at 905 (citation omitted). Here, the district court, while suggesting it might disagree with the issuing judge's probable-cause determination, declined to suppress the firearm because it concluded the good-faith exception applied. We find *Leon*'s good-faith exception inapplicable in the particular circumstances of this case.

As the Court explained in *Leon*, the good-faith exception does not apply if a warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (internal quotation marks omitted). When applying that standard, we consider the objective reasonableness not only of "the officers who eventually executed the warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." *Id.* at 923 n.24. We thus ask whether an objectively reasonable officer could think the

affidavit established probable cause, keeping in mind the inadequacy of a "bare bones" affidavit. *Id.*

We conclude that the affidavit in this case fell short to an extent precluding good-faith reliance on the warrant. As explained, the government's theory of probable cause to search the apartment runs as follows: (i) Griffith might own a cell phone; (ii) if so, his phone might be found in the residence; and (iii) if so, the phone might retain incriminating communications or other information about a crime committed more than one year earlier. Whatever may be the reasonableness of any of those inferences standing on its own, demonstrating probable cause required adequately establishing all three in combination. The affidavit did not approach doing so. It provided no explanation at all of whether Griffith might own a phone or whether any such phone might be in his home. And with regard to whether any phone would retain any incriminating information about a shooting occurring more than one year beforehand, it observed only that gang members often stay in contact about their activities.

Additionally, the affidavit sought, and the warrant granted, authorization to search for and seize every electronic device found in the home. The warrant's material overbreadth in that regard underscored the police's unawareness of the existence of any such devices in the first place (much less the existence of any belonging to Griffith): given that police did not know whether Griffith owned a cell phone or any other electronic device, they could not describe ex ante the devices they would search for and seize. But it was no solution to rely on a catchall provision authorizing seizure of every device they might happen to find in the house. Nothing in the affidavit or warrant supported—or could have supported—probable cause to seize any and all phones, tablets, computers, and other electronic devices in the apartment.

With regard to the warrant's overbreadth, our dissenting colleague emphasizes that, in one previous decision, we applied the good-faith exception to deny suppression of evidence seized under an overbroad warrant. *See infra* at 8-10 (Brown, J., dissenting). But that decision, *United States v. Maxwell*, 920 F.2d 1028, did not purport to hold that the good-faith exception *always* applies in the case of an overbroad warrant. The inquiry is a contextual one, and courts have denied reliance on the good-faith exception when a warrant sweeps too broadly in describing the items subject to seizure. *See United States v. Leary*, 846 F.2d 592, 606-10 (10th Cir. 1988). In *Maxwell*, moreover, we cast no doubt on the existence of probable cause to suspect the presence in the searched residence of at least *some* incriminating items encompassed by the warrant. Here, though, for the reasons explained, the affidavit failed to establish probable cause to believe that *any* cell phone (or other electronic device) containing incriminating information about Griffith's suspected offense would be found in the apartment.

Taken together, those failings as to probable cause and overbreadth bring the warrant beyond the good-faith exception's reach. In so holding, we stress that the inquiry is an objective one. We have no occasion to suspect any ill motive or subjective bad faith on the part of the officers who prepared and executed the warrant. The Supreme Court has found *Leon*'s objective standard unmet notwithstanding the absence of any reason to suppose that officers acted in bad faith in relying on an invalid warrant. *See Groh*, 504 U.S. at 563-65 & n.8. We do the same here.

Further, we do not doubt that most criminals—like most people—have cell phones, or that many phones owned by criminals may contain evidence of recent criminal activity. Even so, officers seeking authority to search a person's home

must do more than set out their basis for suspecting him of a crime. The affidavit in this case might have established the authority to seize an individual; it fell materially short of justifying a search of his home.

IV.

Finally, the government argues we should decline to suppress the firearm because Griffith abandoned the gun by throwing it out of the window. Griffith, though, tossed the firearm in response to the police's announcement that they had a warrant to search the apartment. Because the warrant was invalid and the officers thus lacked authority to execute the announced search, we find suppression of the firearm to be warranted.

Officers may lawfully seize property that has been voluntarily abandoned. *See United States v. Thomas*, 864 F.2d 843, 845-46 (D.C. Cir. 1989). But we do not treat an item as voluntarily abandoned when a person discards it "due to the unlawful activities of police officers, as where the disposal was prompted by police efforts to make an illegal arrest or search." 2 Wayne R. LaFave et al., *Criminal Procedure* § 3.2(h) (4th ed. 2016) (internal quotation marks omitted). For example, in *United States v. Wood*, 981 F.2d 536 (D.C. Cir. 1992), we ordered the suppression of a gun dropped by a suspect after police had unlawfully ordered him to "halt right there," *id.* at 537, 541. Although the suspect had discarded the gun, we found "a direct nexus between the illegal seizure and the recovery of the weapon." *Id.* at 541; *see also United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014); *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990). Our sister circuits likewise uniformly decline to deem evidence voluntarily abandoned when it is thrown away as the direct consequence of officers' efforts to execute an unlawful search

or seizure.  *See United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000); *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995).

Similarly, we cannot treat Griffith's actions here as a voluntary abandonment.  Griffith tossed the gun out of the window only after officers had knocked on the door and announced a search warrant.  The officers' invocation of a warrant was tantamount to a pronouncement that Griffith had "no right to resist the search."  *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).  As soon as police claimed to have a search warrant, Griffith knew he had no choice but to grant them access to his home, either by opening the door and allowing them inside or by submitting to a forced entry after a "reasonable wait time."  *See Hudson v. Michigan*, 547 U.S. 586, 590 (2006) (internal quotation marks omitted).

The government does not dispute that Griffith abandoned the gun in reaction to the officers knocking on the door and announcing they had a search warrant.  The government nonetheless contends that, under *California v. Hodari D.*, 499 U.S. 621 (1991), there was no need to suppress the firearm.  In that case, a suspect ran from a pursuing officer instead of submitting to the latter's show of authority calling for him to stop; and in the course of his flight, he dropped drugs he had been carrying.  *See id.* at 625-26.  The "narrow question" considered by the Court was "whether, with respect to a show of authority . . . a seizure occurs even though the subject does not yield."  *Id.* at 626.  The Court concluded that no seizure had taken place because the subject did not submit to the officer's assertion of authority.  And because there had been no seizure, the abandoned drugs were not the fruit of any seizure and thus need not have been excluded.  *Id.* at 629.

*Hodari D.* differs from this case in significant respects. That case involved an officer's efforts to seize a person on the street, not to search a person's home. An "officer's leave to gather information is sharply circumscribed when he steps off [public] thoroughfares and enters the Fourth Amendment's protected areas," *Jardines*, 133 S. Ct. at 1415, with "the home" standing at "the Amendment's very core," *id.* at 1414 (internal quotation marks omitted). And regardless of the venue, to the extent the attempted seizure of a fleeing person in *Hodari D.* could have implications for the announced search of a home, *Hodari D.* turned on the subject's refusal to submit to the officer's assertion of authority. *See* 499 U.S. at 626-27. If a person submits to the officer's show of authority, *Hodari D.* is inapplicable. *See Wood*, 981 F.2d at 539-41. Here, the officers, upon announcing their possession of a search warrant, proceeded to execute their search of the apartment without any resistance from Griffith or the other occupants.

The government does not dispute that suppression of the firearm would be appropriate if, at the time Griffith tossed it out of the window, the officers had already begun crossing the threshold of the door. At that point, the government evidently allows, a search would have commenced and exclusion of any relinquished evidence would be required. But Griffith, the government emphasizes, abandoned the gun before the officers entered the house—i.e., while they stood at the door poised to enter after having announced they had a search warrant. We see no basis for drawing such a rigid distinction between the officers' announcement of a warrant and their ensuing entry.

Imagine, for example, that police knock on a home's door, falsely claim to have a search warrant, and then ask the resident to hand over all firearms when she comes to the door. She might comply, as the officers, by invoking a warrant, will have effectively announced that she has no right to resist their entry.

*See Bumper*, 391 U.S. at 550. Under the government's theory, there presumably would be no need to suppress the firearms because the officers would have obtained them without entering the home. We reject the suggestion that the admissibility of firearms obtained by virtue of the officers' misconduct in such a situation would turn on whether they happened to have placed one foot inside the home. Indeed, the Supreme Court has elsewhere explained that a person's Fourth Amendment interests in his home "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." *Jardines*, 133 S. Ct. at 1414.

To be sure, officers generally may approach a home and knock on the door without raising any Fourth Amendment concerns. If an occupant responds to the officers' knock by abandoning (or voluntarily turning over) evidence, there will have been no Fourth Amendment violation. But that is because, "[w]hen law enforcement officers *who are not armed with a warrant* knock on a door, they do no more than any private citizen might do." *Kentucky v. King*, 563 U.S. 452, 469 (2011) (emphasis added). When an officer claims to have a warrant, however, she invokes authority unavailable to a private citizen. To conclude otherwise would allow the police to go door-to-door announcing search warrants in the hopes that occupants would respond by abandoning contraband or other evidence within the officers' view.

For those reasons, we decline in this case to draw a talismanic line at the home's door. Once the police assert authority to search a home pursuant to an invalid warrant, evidence relinquished in response to the officers' announcement is unlawfully obtained. Here, consequently, we hold that the firearm abandoned in response to the police's

announcement of an invalid search warrant must be suppressed.

* * * * *

For the foregoing reasons, we reverse the judgment of the district court and vacate Griffith's conviction.

*So ordered.*

BROWN, *Circuit Judge*, dissenting: Today the Court's opinion attempts to write the good faith exception out of our case law. Nothing in the record suggests the officers involved in this case were doing anything other than attempting to solve an unsolved murder while scrupulously observing the letter of the law. Yet, today's opinion impugns their motives by declaring their reliance upon a search warrant approved by a disinterested magistrate to be "entirely unreasonable." It also misconstrues the very purpose of the exclusionary rule and the point of the good faith exception by applying the former and rejecting the latter in a way that contradicts precedent from both the Supreme Court and this Court. Because I believe the good faith exception to the exclusionary rule easily encompasses the facts of this case, I respectfully dissent.

## I.

### A.

As explained by the Supreme Court, "[t]he Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . [but] says nothing about suppressing evidence obtained in violation of this command." *Davis v. United States*, 564 U.S. 229, 236 (2011). Consequently, the use of evidence obtained pursuant to an unlawful search or seizure "work[s] no new Fourth Amendment wrong." *United States v. Calandra*, 414 U.S. 338, 354 (1974). Moreover, the exclusion of evidence is "not a personal constitutional right," *Stone v. Powell*, 428 U.S. 465, 486 (1976), "nor is it designed to redress the injury occasioned by an unconstitutional search," *Davis*, 564 U.S. at 236. Instead, the exclusionary rule is a "prudential doctrine" created to "compel respect" for the Fourth Amendment's guaranty against unreasonable searches and seizures. *Id.*

2

Deterring law enforcement officials from engaging in future Fourth Amendment violations supports this goal. *Herring v. United States*, 555 U.S. 135, 141 (2009); *Calandra*, 414 U.S. at 348. However, the mere fact that the exclusion of evidence would result in deterrence is alone insufficient to justify the exclusion of evidence. *See Hudson v. Michigan*, 547 U.S. 586, 596 (2006) (stating the existence of deterrence benefits "is a necessary condition for exclusion," but not a "sufficient" one); *see also Calandra*, 414 U.S. at 350 (stating the Fourth Amendment does not "require[] adoption of every proposal that might deter police misconduct"). For this reason, the Supreme Court has limited the exclusionary rule's application to situations where the rule's deterrence purpose is "most efficaciously served." *United States v. Leon*, 468 U.S. 897, 908 (1984). Thus, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Davis*, 564 U.S. at 237 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).

The calculus is simple: The suppression of evidence that is otherwise probative and reliable results in "substantial social costs." *Leon*, 468 U.S. at 907. "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." *Herring*, 555 U.S. at 141. Furthermore, if applied indiscriminately, courts run the risk of "generating disrespect for the law and administration of justice." *Stone*, 428 U.S. at 491. Society, the Supreme Court has held, "must swallow this bitter pill" only "as a last resort." *Davis*, 564 U.S. at 237. Therefore, in addition to showing the suppression of evidence will significantly deter unlawful behavior in the future, parties arguing for suppression must overcome the "high obstacle" of the rule's "costly toll upon truth-seeking and law enforcement objectives" through

demonstrating the benefits of suppression outweigh these significant costs. *Herring*, 555 U.S. at 141.

In *United States v. Leon*, the Supreme Court recognized a good faith exception to the exclusionary rule for evidence obtained by law enforcement officers acting in "objectively reasonable reliance" on a search warrant issued by a "detached and neutral magistrate" that has ultimately been found to be invalid. *Leon*, 468 U.S. at 913, 920–22. The Court explained "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. Furthermore, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination." *Id.* at 921. Thus, "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* at 922.

The only instances in which the good faith exception does not apply are when the law enforcement officers are "reckless," "dishonest," or "could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926; *see also Illinois v. Krull*, 480 U.S. 340, 348–49 (1987) (stating "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional"). Accordingly, if a magistrate relies upon a "bare bones" affidavit that is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," suppression is appropriate. *Leon*, 468 U.S. at 923 & n.24.[1] However, the use of such an extreme remedy

---

[1] The Court contends its result is "the same" as *Groh v. Ramirez*, 540 U.S. 551 (2004), where, the Court claims, "[t]he Supreme Court . . . found *Leon*'s objective standard unmet notwithstanding the absence

when law enforcement officers have sought a warrant is extremely rare, and the Supreme Court has only applied the exclusionary rule to such situations where police conduct was both intentional and highly culpable. *Herring*, 555 U.S. at 143–44; *see also Davis*, 564 U.S. at 240 (stating the Supreme Court has "never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct").

Furthermore, Supreme Court case law makes clear that a "bare bones" affidavit is one supported only by the "bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *see also Nathanson v. United States*, 290 U.S. 41, 44–47 (1933) (invalidating a warrant supported only by an affidavit stating the officer "ha[d] cause to suspect and [did] believe that" liquor illegally brought into the United States was located on certain premises); *Aguilar v. Texas*, 378 U.S. 108, 109–15 (1964) (invalidating a warrant based solely on an officer's statement that he had "received reliable information from a credible person and [did] believe" that heroin was stored in a particular home); *Giordenello v. United States*, 357 U.S. 480, 486 (1958) (striking a warrant issued where the complaint contained "no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein," failed to

---

of any reason to suppose that officers acted in bad faith in relying on an invalid warrant." Maj. Op. at 24. But *Groh cited Leon* to hold "the warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." *See* 540 U.S. at 558. Moreover, the Court's pin cites to *Groh* include the Supreme Court explaining why "no reasonable officer could believe" the warrant at issue was constitutionally sound. *See id.* at 564–65. When the Court relies on a case where an officer is found *plainly incompetent*—the standard for piercing his qualified immunity—how can the Court credibly claim it is *not* passing judgment on the officers relying on the warrant here? *See* Maj. Op. at 24.

"indicate any sources for the complainant's belief," and did not set forth "any other sufficient basis upon which a finding of probable cause could be made"). Thus, only where an affidavit is "so lacking in sworn and particularized information that not even an order of court [could] have justified [the search]" can it be properly characterized as bare bones. *See Herring*, 555 U.S. at 143–44.

## B.

The warrant in this case established probable cause for the search. The affidavit submitted by Detective Giannakoulias begins by giving the exact address of the apartment to be searched and describing the building in which it is located. It then details Detective Giannakoulias's extensive experience as a law enforcement officer, including 22 years of service at the Metropolitan Police Department, formal training in criminal, death, gang, and narcotics investigations, 10 years of experience investigating gang-related murders, and the execution of over 500 search warrants for various drug and violent crimes. The next 8 pages of the affidavit provide detailed information of the investigation of the murder of Mico Briscoe—a crime that took place over a year before police sought the current search warrant—and Ezra Griffith's connection to the crime.

The affidavit described the murder and the existence of video footage capturing a gold, four-door sedan leaving the scene of crime with two murder suspects in it. It then described the police's efforts to identify and locate the car captured by the surveillance footage, which eventually led them to Ms. Jesimenia Queen—Griffith's mother—who they then interviewed about the car and its connection to the Briscoe murder. Queen confirmed the car used to belong to her and was used exclusively by Griffith, "a validated member" of the

6

"E Street Bangaz" gang. App'x 30–31. After he became aware of this interview, Griffith made jail house calls to numerous people, including his mother, his grandmother, Dwayne Hilton, and Sheree Lewis. These calls often discussed the police interview about the car and its association with the Briscoe murder. 20 days after making these calls, Griffith was released from prison, and police were eventually able to locate his address as being with Lewis at the location for which they sought a warrant.

Only after providing all of these details did Detective Giannakoulias rely on his training and experience to assert that gang members maintain regular contact with each other, even while incarcerated, and they discuss criminal activities through phones or other electronic devices. The affidavit ends by requesting the seizure of:

> all electronic devices to include but not limited to cellular telephone(s), computer(s), electronic tablet(s), devices capable of storing digital images (to include, but not limited to, PDAs, CDs, DVD's jump/zip drives), evidence of ownership of such devices, subscriber information relating to the electronic devices, any information describing, referencing, or mentioning in anyway the [shooting death of Mico Briscoe], any handwritten form (such as writing to include but not limited to notes, papers, or mail matter), photographs, newspaper articles relating to the shooting death of Mico Briscoe, and any indicia of occupancy of the premises described above.

App'x 36. After reviewing Detective Giannakoulias's affidavit, a magistrate from the Superior Court of the District

of Columbia determined that it established probable cause and authorized law enforcement officers to seize the items listed in the affidavit.

Even if this Court were to assume Detective Giannakoulias's affidavit failed to establish probable cause to search Lewis's apartment, I can find no discernable basis to justify the Court's assertion that the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Maj. Op. at 22. Based on the affidavit, it was reasonable for the magistrate to conclude Griffith was either directly involved with the Briscoe murder or had vital information regarding its commission. Additionally, the police knew Griffith actively communicated with both his family and other suspects about the Briscoe murder while he was incarcerated. These communications provided concrete facts to support Detective Giannakoulias's assertion that gang members share intelligence with each other, even while incarcerated. Moreover, there was at a minimum a fair probability that Griffith would continue to have conversations about the investigation of the Briscoe murder, given the close proximity of his release from prison with his last jailhouse call—a mere 20 days. An investigator's common sense would also lead him to conclude that Griffith would speak much more freely and candidly about his involvement in the Briscoe murder once his communications were not being monitored by the police.[2] Thus, concrete facts existed from which investigators could infer Griffith was involved with the Briscoe murder and was talking to his confederates about it.

---

[2] At numerous points during his jailhouse calls, Griffith begins discussing the murder and the investigation but quickly changes the subject so as to avoid making any incriminating statements.

In dismissing these logical inferences, the Court focuses on the fact that the affidavit does not mention Griffith owning or using a cell phone. But these statements ignore the realities of the world in which we live and jettison the common-sense inquiry judges are to make when determining the existence of probable cause. *See Gates*, 462 U.S. at 238 ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *see also United States v. Davis*, 617 F.2d 677, 692 (D.C. Cir. 1979) (stating judges evaluating the existence of probable cause "need not confine their evaluations within rigorous legalistic boundaries but instead may use their common sense"). The Supreme Court has recognized that "a significant majority of American adults now own [cell] phones." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014). This statement is confirmed by the Pew Research Center, whose research indicates that in 2013 over 90% of American adults owned a cell phone. *See* Lee Rainie, *Cell Phone Ownership Hits 91% of Adults*, PEW RESEARCH CENTER (June 6, 2013), http://www.pewresearch.org/fact-tank/2013/06/06/cell-phone-ownership-hits-91-of-adults/. Furthermore, this number jumps up to *97%* for adults between ages 18 and 34. *Id.* Thus, the Court's assertion that the affiant's failure to allege that Griffith owned a cell phone somehow resulted in a bare bones affidavit devoid of any indicia of probable cause that Griffith did, in fact, own a cell phone is "[p]ure applesauce." *King v. Burwell*, 135 S. Ct. 2480, 2501 (2015) (Scalia, J., dissenting).

While the Court is, admittedly, on firmer grounds when assessing the warrant's shortfalls as to other electronic devices, this is an issue of breadth, not whether there was any indicia of probable cause, and this Court has never refused to apply the good faith exception because a warrant was overbroad. On the contrary, this Court's previous approach has been to "decline

to order the suppression of the evidence seized pursuant to" a warrant "we conclude[d] . . . was overly broad" so long as the law enforcement officers "reasonably relied on the warrant in good faith." *United States v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990). In *United States v. Maxwell*, this Court applied the good faith exception to a fatally overbroad warrant authorizing the seizure of all of the following:

> any and all seals representing or appearing to represent any agency of the United States; any and all writings and documents representing or appearing to represent any agency of the United States; any interstate or foreign correspondence, handwritten notes, carbons, bank records, negotiable instruments, logs, ledgers, address books, travel documents, memoranda or notations pertaining to interstate or foreign commerce; transmissions made pertaining to interstate or foreign commerce; any and all documents generated in connection with or evidencing a scheme, artifice or devise of transactions in interstate or foreign commerce; any electronic memory equipment, materials, tapes, records, discs, discettes or any other medium used to store information pertaining to interstate or foreign commerce; all machinery, equipment, or transmitting devices used or capable of being used to send via interstate or foreign commerce: sounds, signals, pictures, or writings transmitted by wire for the purpose of executing such scheme or artifice.

*Id.* at 1033. Comparing the *Maxwell* warrant to the one at issue in this case, I see no discernable reason why one falls within the good faith exception and the other does not. If anything, the warrant at issue in this case is much narrower. While the *Maxwell* warrant essentially allowed police to seize "all or

virtually all of [the defendant's] business records and equipment," *id.*, the warrant in this case is essentially limited to any electronic devices owned or likely to be used by Griffith and capable of electronically communicating or storing information and any documents relating to the Briscoe murder, *see* App'x 36.

Moreover, the warrant in this case did not authorize a general search of all of Griffith's records and the files contained within any electronic devices discovered. On its face, the warrant only authorized the *seizure* of the electronic devices, not a *search* of their content. As explained by the government both in its brief and at oral argument, an additional search warrant was required in order for law enforcement officers to search within these devices. Gov't Br. 29–30 & n.15; Oral Arg. Rec. at 24:40–25:02. These additional protections show that the officers here were operating in the real, tech-savvy world and doing their best to adapt available tools to act within the law, all while investigating an unsolved murder for which they had few leads prior to connecting Griffith to the car captured on videotape leaving the scene of the crime. While this Court seems unconcerned with handcuffing the ability of police to investigate crimes, our precedent emphasizes that our probable cause analysis should reflect a proper "concern[] with [the] realities of administration of criminal justice." *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987).

Equally troubling is the Court's willingness to cast aside the vital role an officer's training and experience play in establishing probable cause and good faith. The affiant in this case had 22 years of experience working as a law enforcement officer and had spent 10 of those years specializing in gang-related murders. An officer with these credentials should be entitled to some deference or, at a minimum, not to have his

11

reliance on his training and extensive experience maligned as wholly unreasonable. However, this is precisely what the Court has done, despite the fact we have repeatedly held an officer's training and experience can play a vital role in establishing probable cause. *See United States v. Cardoza*, 713 F.3d 656, 661 (D.C. Cir. 2013) (finding an officer's knowledge based on his training and experience reinforced finding probable cause); *United States v. Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006) (finding an affidavit based largely on the affiant's professional experience to be sufficient to establish probable cause); *United States v. Thomas*, 989 F.2d 1252, 1254–55 (D.C. Cir. 1993) (same).

Recognition of the realities of criminal investigations and common sense seem conspicuously absent from the Court's approach. Relying on a series of nonsequiturs, the Court creates a world in which it is unreasonable to assume Griffith's behavior will be similar to 90% of the adult population (i.e. he will have access to one or more cell phones); inconceivable that recent hot leads in a stale murder investigation might engender conversation among gang members who were likely involved in the killing; and risible to think leads relating to criminal activity might be found in the call history, texts, or e-mail of several phones to which Griffith had access, rather than only on a phone for which he is the listed subscriber. Oddly, the Court does think the warrant establishes probable cause to arrest Griffith and subject him to a search incident to arrest and an inventory booking search, although the same facts are not sufficient to sustain a search warrant or to demonstrate good faith on the part of the officers.

The facts of this case illustrate precisely why the good faith exception is so vital to our Fourth Amendment jurisprudence. As the Court acknowledges, there is no indication of bad faith or recklessness on the part of these

officers. They were diligently trying to build their case, relying on the limited—but promising—evidence available to them. Their investigation into the Briscoe murder—a crime that had occurred over a year before they sought the warrant to search Griffith's apartment—had reached a lull until they discovered Griffith's car and connected it to him. Once they made this connection, they did not act rashly or hastily by attempting to coerce a confession out of Griffith but instead approached their investigation in a methodical and deliberate manner in order to discover the truth. They collected evidence by interviewing Griffith's mother and reviewing his jailhouse calls. After coming to the conclusion that Griffith was probably involved in the Briscoe murder and that their recent investigatory progress might trigger a desire to communicate with the other suspects, they sought a warrant to obtain any devices which might contain incriminating statements from Griffith or other leads. Thereafter, they planned to obtain yet another warrant to authorize them to search any electronic devices they seized. Nothing in the facts suggest they sought to deceive the magistrate or that they did anything other than present the limited evidence they had in hopes that it would establish probable cause. Once the magistrate held their evidence sufficient, they relied upon that determination to search the apartment, and they did so in a way that complied with the law—i.e. knocking and announcing before entering and limiting their search to the confines of the warrant. The search confirmed their instincts were good. They recovered six cell phones and an electronic tablet—certainly an atypical number of phones for a household consisting of two adults. In the process of conducting the search, they discovered Griffith was guilty of another crime: unlawfully possessing a firearm.

13

II.

And that is perhaps the most troubling part of this case at the end of the day.  There is no doubt that Griffith is guilty of the crime for which he has been convicted.  By suppressing the gun Griffith unlawfully possessed, the Court is going to "offend[] basic concepts of the criminal justice system" by allowing a "guilty and possibly dangerous defendant[] go free." *Herring*, 555 U.S. at 141.  And they are allowing this to happen not because the police intentionally violated the law or acted in a highly-culpable manner, but rather because the police relied upon a neutral and detached magistrate who determined probable cause existed.  This result is directly contrary to the purpose of the exclusionary rule and Supreme Court precedent that reserves suppression only for the most serious police misconduct.  If courts are going to impose a remedy as extreme as excluding evidence that is probative, reliable, and often determinative of a defendant's guilt, we have a duty to protect officers who are doing their best to stay within the bounds of our ever-evolving jurisprudence.  We live in a society where virtually every action an officer takes is now being heavily-scrutinized.  Thus, the need for vindication when law enforcement officers behave in an exemplary fashion is more critical than ever.  Unfortunately, the officers in this case are not going to get the vindication they deserve.  Furthermore, I have no doubt this case will be used in future cases to further undermine the good faith exception until either this Court sitting *en banc* or the Supreme Court steps in to cure today's grievous error.  Accordingly, I respectfully dissent.