**Petition for Writ of Mandamus Conditionally Granted, in Part, and Denied, in Part, and Opinion filed February 25, 2020.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-19-00664-CR

---

### IN RE TERESA L. RIBELIN COOK, Relator

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**178th District Court**
**Harris County, Texas**
**Trial Court Cause No. 17-22196**

---

## OPINION

Teresa L. Ribelin Cook's legal files were seized pursuant to a search warrant executed on her attorney's office. The Honorable Kelli Johnson, presiding judge of the 178th District Court of Harris County, signed an order on August 23, 2019, permitting a "taint team" from the Harris County District Attorney's Office

("HCDA's Office") access to Cook's files to search for evidence in the case against Cook's attorney. Cook filed a petition for writ of mandamus in this court asking that we compel Judge Johnson to vacate her August 23, 2019 order and direct that the files be returned to Cook. *See* Tex. Gov't Code § 22.221; *see also* Tex. R. App. P. 52. We conditionally grant the petition, in part, and deny it, in part.

## BACKGROUND

Amy Holsworth Castillo is a former client of attorney Jared Woodfill ("Woodfill") and the Woodfill Law Firm, P.C. (the "Firm"). Castillo alleged that Woodfill misapplied funds from her divorce by using funds he had not yet earned on her case and spending those funds for services rendered on behalf of other clients. Bryan Vaclavik, the chief fraud examiner for the HCDA's Office, investigated Castillo's allegations by obtaining and reviewing bank statements of the Firm's IOLTA account.

Cook was also Woodfill's client. During Vaclavik's review of the Firm's IOLTA account, it appeared that Cook's funds were also used contrary to her attorney client agreement. Cook and Woodfill's attorney client agreement required Cook to pay a $75,000 retainer. Cook's $75,000 check was deposited into the Firm's IOLTA account on June 13, 2013. One day before Cook's check was deposited, the IOLTA account was overdrawn with a negative balance of $49,679.18. According to Vaclavik, Cook's funds were used to offset the negative balance and to cover a check payable to a third party unrelated to Woodfill's representation of Cook. Cook's billing invoice for the period of June 6 through June 12, 2013, showed that the Firm had only earned and expended $1,313.29 of Cook's retainer. On June 13,

2

2013, the IOLTA account's ending balance was $25,320.82, indicating that Woodfill had used more than $45,000 of Cook's retainer for purposes unrelated to her case.

In his affidavit in support of the search warrant, Vaclavik stated that he had reason to believe the Firm's office contained evidence of the felony offenses of misapplication of fiduciary property, theft, and money laundering. Vaclavik asked to be allowed to seize the following documents, among other items:

> Any and all financial, legal files, documents, records, books, ledgers and correspondence(s) containing the names of Amy Holsworth Castillo and Teresa L. Ribelin Cook.

On November 11, 2018, the trial court signed a search warrant, authorizing the seizure of Cook's legal files from the Firm. The search warrant provides, in relevant part:

> THEREFORE, YOU ARE COMMANDED to go straightaway to the offices of the Woodfill Law Firm, P.C., located at Three Riverway, Suite 750, Houston, Harris County, Texas 77056 for the purpose of searching for, seizing, and searching within when necessary, property constituting evidence used to commit the felony offenses of misapplication of fiduciary property, theft and money laundering as well as property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense. These implements, instruments, property and evidence alleged in the attached affidavit include but are not limited to:
>
> 1. Any and all financial, legal files, documents, records, books, ledgers and correspondence(s) containing the names of Amy Holsworth Castillo and Teresa L. Ribelin Cook;

2. Any and all documents and records pertaining to the transfer of currency via financial instruments, automatic clearing house (ACH) or wires of United States or foreign currency, funds for the above individuals identified in item l;

3. Any and all the computer hardware, software, and peripherals that are believed to potentially contain some or all of the items described in this warrant; computers, central processing units, computer disks, disk drives, monitors, computer printers, modems, digital cameras, any memory devices that work with a digital camera, scanners, computer photographs, and any electronic data storage device, including but not limited to flash memory devices, and other storage media; any input/output peripheral devices, including but not limited to data security devices and related documentation; any and all cellphones, telephones, communication devices that are capable of storing pictures, video, text, caller identification devices and telephone recording equipment, including the stored data of such devices for the purpose of conducting an on-site or off-site search of these computer materials by any qualified forensic facility for imaging and analysis by experts and to retain all such computer materials within the forensic facility; and

4. Any logins and passwords for computers, software, file sharing access, telephones, communication devices owned by Jared Ryker Woodfill V and or the Woodfill Law Firm, P.C.

The search warrant was executed on November 12, 2018, and the Houston Police Department took 127 boxes of files belonging to Cook from the Firm.

Cook refused to waive her privileges to her files. The HCDA's Office tried to reach an agreement with Cook about how they could review her files. No agreement was reached. On July 2, 2019, Cook filed a brief regarding her seized files and asked the trial court to order the HCDA's Office to return her files to her. The trial court held an in-chambers hearing.

4

During the hearing, the Assistant District Attorney ("ADA") advised the trial court that the "taint team," which is comprised of ADAs who are not involved in the case, was ready to start going through Cook's files. Cook argued that permitting the taint team to look at her files would her violate constitutional right to privacy and her evidentiary privileges. The trial court urged the parties to reach an agreement about the review of Cook's files.

On August 22, 2019, the HCDA's Office filed a motion for protective order and procedure for review of confidential or privileged discovery materials, which would allow the taint team to conduct the review. On August 23, 2019, Cook filed a brief regarding the validity of the search warrant, and the trial court held another hearing the same day. The trial court signed the following order setting forth the procedure for the taint team's review of Cook's files:

> COMES NOW, THE STATE OF TEXAS, . . . moves this Court for a protective order to ensure that disclosure of potentially confidential or privileged materials related to this proceeding are appropriately limited. *See* TEX. R. EVID. 503; TEX. DISCIPLINARY R. PROFESSIONAL CONDUCT 1.05. At the same time, the undersigned . . . . move to the Court to allow limited members of the Harris County District Attorney's Office—namely, members of the taint team—and Defense Counsel full access to the alleged confidential or privileged material, and to establish a procedure for disclosure of non-confidential and non-privileged material. The alleged confidential or privileged material has not yet been viewed by the Harris County District Attorney's Office; however, in an abundance of caution, the State has constructed this procedure to prevent any confidential or privileged documents from reaching the prosecutor or prosecutors who are investigating the above-captioned matter.
>
> l. This Order supplements all other discovery rules and orders.

5

2. This Order may be modified or amended for good cause. The parties shall submit any proposed modifications or amendments to this Court.

3. The alleged confidential or privileged materials relate to the seizure of evidence pursuant to the search warrants for Jared Woodfill's office, on or about November 12, 2018. The evidence in question consists of multiple boxes containing documents and the data stored on electronic devices seized in connection with the above search warrant.

4. The documentary evidence in question is stored in a secure location within the Harris County District Attorney's Office. The digital evidence is stored in a secure location at the offices of the United States Secret Service in Houston, Texas.

5. Until further Order of the Court, the evidence in question will be made available to the attorney of record for the defendant(s).

6. Until further Order of the Court, Assistant District Attorneys . . . are permitted to review the alleged confidential or privileged materials, and are not permitted to discuss the content of these materials with other members of the Harris County District Attorney's Office or law enforcement. Members of the United States Secret Service forensic services team . . . are necessary to image and/or format electronically stored data for review. Their review of the material made the subject of this Order is limited to that task. . . . [A]nalysts of the United States Secret Service who review the digital evidence as part of the taint team, are not permitted to discuss the content of these materials with members of the Harris County District Attorney's Office or law enforcement who are not a member of the taint team.

7. The alleged confidential or privileged materials will be assigned to three separate categories; namely, (l) evidence that the State and Defense agree is not subject to the attorney-client privilege, (2) evidence that the State and Defense agree is subject to the attorney-client privilege, (3) evidence that the State and Defense do not agree is subject to the attorney-client privilege.

8. Materials in the third category, material the parties do not agree is subject to the attorney-client privilege, will be designated for this Court's review in camera to assess whether the materials are subject to the attorney-client privilege.

Thus, the trial court ordered that the documents are to be segregated into three categories: (1) evidence that the parties agree is not subject to the attorney-client privilege; (2) evidence that the parties agree is subject to the attorney-client privilege; and (3) evidence that the parties do not agree is subject to the attorney-client privilege, which will be designated for in camera review by the trial court. The order only addresses documents protected by the attorney-client privilege, not the work product privilege.

At the hearing, the trial court further ruled that Cook and her attorney, John J. Durrschmidt, who is representing Cook in the underlying proceeding to recover her files, will go into the room with the taint team and identify the documents Cook believes are privileged. The trial court further ordered that, if there is any dispute regarding whether documents are privileged, the court will address the dispute at a later hearing. Finally, the trial court ruled that Cook lacked standing to assert her constitutional right to privacy and her evidentiary privileges.

The boxes containing Cook's files are being stored in a locked room in the HCDA's Office. Cook's divorce case is still pending, and Woodfill still represents Cook in that case. This court granted Cook's request to stay the August 23, 2019 order pending a decision on her petition for writ of mandamus. In this mandamus proceeding, Cook does not challenge the review procedure ordered by the trial court, but instead argues that HCDA's Office is not entitled to any review of her files and

7

that it must return all her files. Cook maintains that the seizure of her files has prevented her from prosecuting her pending divorce case.

## ISSUES

Cook claims that (1) the search warrant, which resulted in the seizure of her files, was overly broad; (2) the seizure of her files violated her Fourth and Fifth Amendment rights to privacy and property; (3) the seizure of her files violated her attorney-client and work product privileges (4) she has standing to assert her attorney-client and work product privileges; and (5) she has standing to assert her constitutional claims of privacy and to her property.

## MANDAMUS STANDARD OF REVIEW

To be entitled to mandamus relief, a relator must show (1) that the relator has no adequate remedy at law for obtaining the relief the relator seeks; and (2) what the relator seeks to compel involves a ministerial act rather than a discretionary act. *In re Powell*, 516 S.W.3d 488, 494–95 (Tex. Crim. App. 2017) (orig. proceeding). A ministerial act does not involve the use of judicial discretion; instead, a ministerial act must be positively commanded and so plainly prescribed under the law as to be free from doubt. *In re Harris*, 491S.W.3d 332, 334–34 (Tex. Crim. App. 2016) (orig. proceeding). In other words, the relator must have a clear right to the relief sought, meaning that the merits of the relief sought are beyond dispute. *In re McCann*, 422 S.W.3d 701, 704 (Tex. Crim. App. 2013) (orig. proceeding) (internal quotations marks and citation omitted). "To show a clear right to the relief sought, a relator must show that the facts and circumstances of the case dictate but one rational decision under unequivocal, well-settled . . . and clearly controlling legal

principles." *Id.* As to an adequate remedy at law, even if a relator has a remedy at law, the relator "can show that no *adequate* legal remedy exists at law if the remedy is so uncertain, tedious, burdensome, slow, inconvenient, inappropriate, or ineffective as to be deemed inadequate." *Id.*

**ANALYSIS**

## I.    Search Warrant

### A.    Standing to Challenge

Cook challenges the validity of the search warrant. The trial court held that Cook does not have standing to assert her right to her property and evidentiary privileges. Accordingly, we first address Cook's standing.

The attorney-client privilege is personal to the client, and the right to waive the privilege belongs solely to the client. *Bailey v. State*, 507 S.W.3d 740, 745 (Tex. Crim. App. 2016); *Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997). Cook also has right to assert the work-product privilege to prevent documents falling within the scope of the privilege from being produced to another party. *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 221–22 (Tex. 2004) (orig. proceeding) (per curiam) (defendant asserting work-product privilege in addition to attorney-client privilege). Furthermore, a client owns the contents of his or her file. *McCann*, 422 S.W.3d at 705. Cook owns her files, and she has standing to assert her rights to her property and the attorney-client and work product privileges.

9

## B.    Probable Cause

Cook contends there was no probable cause that evidence of the felony offenses of misapplication of fiduciary property, theft, and money laundering would be found in her files.  The United States and Texas Constitutions provide that no search warrant shall issue except upon probable cause as supported by oath or affirmation.  *Aguirre v. State*, 490 S.W.3d 102, 107–08 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing U.S. Const. amend. IV; Tex. Const. art I, § 9).  Similarly, the Texas Code of Criminal Procedure provides that no search warrant shall issue except upon an affidavit establishing probable cause.  *Id.* (citing Tex. Code Crim. Proc. art. 18.01(b)).

Probable cause exists when, under the totality of the circumstances, there is a fair probability that the items to be seized will be found at the specified location.  *State v. Elrod*, 538 S.W.3d 551, 556 (Tex. Crim. App. 2017).  Probable cause is a flexible and non-demanding standard.  *State v. Le*, 463 S.W.3d 872, 878 (Tex. Crim. App. 2015).  In determining whether a warrant sufficiently establishes probable cause, the court is bound by the four corners of the affidavit.  *Elrod*, 538 S.W.3d at 556.

Generally, a reviewing court applies a presumption of validity regarding a magistrate's determination that a search warrant affidavit supports a finding of probable cause.  *Hyland v. State*, 574 S.W.3d 904, 911 (Tex. Crim. App. 2019).  When reviewing a magistrate's decision to issue a warrant, we apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant as opposed to a warrantless search.  *State v. McLain*,

10

337 S.W.3d 268, 271 (Tex. Crim. App. 2011). As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable cause determination. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). "We are instructed not to analyze the affidavit in a hyper-technical manner." *McLain*, 337 S.W.3d at 271 (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). "[W]hen an appellate court reviews an issuing magistrate's determination, the court should interpret the affidavit in a commonsensical and realistic manner, recognizing that the magistrate may draw reasonable inferences." *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007). When in doubt, we defer to all reasonable inferences that the magistrate could have made. *Bonds*, 403 S.W.3d at 873.

Vaclavik's affidavit described the deposit of Cook's retainer check into Woodfill's IOLTA account and the use of the retainer check to cover a negative balance in the IOLTA account. The affidavit further described the amount of the retainer that had been expended on Woodfill's representation of Cook as compared to the amount used for purposes unrelated to Cook's divorce case. The trial court could have inferred that evidence related to the Woodfill allegations could have been found in Cook's files. As a reviewing court, we defer all reasonable inferences the trial court could have made and conclude that there was probable cause to support the search warrant.

## C. Scope of the Search Warrant

Cook argues that the search warrant was an impermissible "general" search warrant. The United States and Texas Constitutions "prohibit general warrants

11

which fail to particularly describe the property to be seized and allow general, exploratory rummaging in a person's belongings." *Walthall v. State*, 594 S.W.2d 74, 78 (Tex. Crim. App. 1980) (internal quotation marks and citations omitted). The Fourth Amendment's particularity requirement "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his powers to search." *Bonds*, 403 S.W.3d at 874 (quoting *Groh v. Ramirez*, 540 U.S. 551, 561 (2004)); *see also Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."). A warrant with "indiscriminate sweep" is "constitutionally intolerable." *Stanford v. Tex.*, 379 U.S. 476, 486 (1965).

In *Andresen v. Maryland*, the State's Attorneys' Offices started investigating real estate settlement activities. 427 U.S. 463, 465 (1976). During the investigation, the activities of the defendant, an attorney who specialized real estate settlements, came under scrutiny, particularly in connection with the purchase of a specific lot— "Lot 13T." *Id.* The investigation, which included interviews with the purchaser, mortgage holder, and other lien holders and an examination of county land records, revealed that the defendant, acting as settlement attorney, had defrauded the purchaser of Lot 13T. *Id.* Concluding there was probable cause to believe that the defendant had committed the state crime of false pretenses, investigators applied for warrants to search the defendant's law office and the separate office of a corporation

12

of which the defendant was the incorporator, sole shareholder, resident agent, and director for specified documents pertaining to the sale of the lot. *Id.* at 466. The search warrants were issued and executed, between 2% and 3% of the files in the law office were seized, and less than 5% of corporation's files were seized. *Id.* at 466–67.

Andreson complained that the addition of the phrase, "together with other fruits, instrumentalities and evidence of crime at this (time) unknown," to the end of a sentence containing a lengthy list of specified and particular items to be seized pertaining to Lot 13T in each search warrant made the warrants impermissible "general" warrants. *Id.* at 478–79. The court concluded that the challenged phrase must be read as authorizing only the search for and seizure of evidence relating to the offense of false pretenses with respect to Lot 13T, not evidence of other crimes. *Id.* at 480–81.

Andreson further asserted that the seizure of documents pertaining to another lot were not relevant to the Lot 13T charge and were used to help form the evidentiary basis for a different charge, which showed that the documents were seized solely for that purpose, in violation of the court's previous decision in *Warden v. Hayden*.[1] *Id.* at 482. In *Warden*, the court rejected the distinction between "seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband." 387 U.S. at 300–01. Even when seizing "mere evidence," probable

---

[1] 387 U.S. 294 (1967).

cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. *Andresen*, 427 U.S. at 483.

The *Andresen* court concluded that the trained special investigators reasonably could have believed that the evidence involving another lot could be used to show the defendant's intent with respect to the Lot 13T transaction. *Id.* The events surrounding the Lot 13T transaction and the other lot's transaction had many similarities and were relevant to show intent to defraud with respect Lot 13T, and seizure of the documents was permitted. *Id.* at 484. Although the records of the other lot were subsequently used to secure additional charges against the defendant, their seizure was permitted because they satisfied the requirements of probable cause. *Id.*

We conclude there was probable cause to search Cook's files to investigate offenses Woodfill allegedly committed with Cook's retainer. According to Vaclavik's affidavit, Cook's retainer check was deposited into Woodfill's IOLTA account and was used to cover a negative balance in the IOLTA account. Vaclavik further described the amount of the retainer that had been expended on Woodfill's representation of Cook as compared to the amount of the retainer that was used for purposes not related to Cook's divorce case. The warrant to search Cook's files is specific as to the investigation of Woodfill's alleged crimes.

Courts have upheld search warrants under similar circumstances. In *United States v. Lebovitz*, a search warrant permitted the seizure of 25 client files from a law firm's office. 506 F. Supp. 249, 250–51 (W.D. Pa. 1980). The affidavit stated the defendant attorneys and their firm represented clients who were involved in

14

accidents in claims against insurance companies. *Id.* at 250. The affiant interviewed the doctor to whom the clients were referred for treatment. *Id.* The doctor stated that he furnished the attorney and the firm with false and inflated medical bills and physicians' reports. *Id.* The doctor further stated that on two or three occasions, one of the attorneys came to the doctor's office to obtains bills and physicians' reports on the clients and the doctor prepared inflated bills and reports in the presence of that attorney. *Id.*

The *Lebovitz* court held that a magistrate could reasonably infer that some member of the law firm knew the bills were inflated, thus finding probable cause for the issuance of the search warrant. *Id.* The court also rejected the defendant's contention that the search warrant was a general warrant. *Id.* at 251. The warrant was specific as to the place to be searched and the particular client files involved and only permitted the seizure of 25 specifically named client files from a law firm with hundreds of files. *Id.*; *see also United States v. Hershenow*, 680 F.2d 847, 850–53 (1st Cir. 1982) (upholding search warrant for all of doctor's auto-accident patient files for a specified three-year period in connection with alleged scheme to defraud insurance companies by submitting false or inflated bills for those patients because the facts in the underlying affidavit reasonably supported an inference that the doctor's fraudulent activity probably encompassed his entire accident practice); *Fink v. State*, 817 A.2d 781, 784–87 (Del. 2003) (upholding search warrant of attorney's home and car for client files, not limited to specific files for which complaints about the attorney's personal use of client funds had been reported, because the attorney's failure to turn over the specific files to the receiver pursuant to a court order provided

15

a reasonable basis to conclude that the attorney had additional undisclosed files at home or in his car).

Cook acknowledges that her files were specifically described in the search warrant but complains that the specific documents concerning any financial crimes to be seized were not described with particularity. However, it is not necessary for a search warrant "to specify the precise documents sought (often an impossible task) in order to satisfy the Fourth Amendment." *United States v. Vanichromanee*, 742 F.2d 340, 347 (7th Circ. 1984).

Cook relies on an opinion from the District of Columbia Circuit Court of Appeals in support of her contention that the search warrant is overly broad. *See United States v. Griffith* 867 F.3d 1265 (D.C. Cir. 2017). In *Griffith*, the police obtained a warrant to search Griffith's residence in connection with an investigation of a homicide that had occurred more than one year earlier. *Id.* at 1268. Investigators concluded that the shooting related to a conflict between rival gangs. *Id.* The officers knew that Griffith was a member of one of the rival gangs and suspected that he drove the getaway car, which surveillance footage had captured circling the scene. *Id.* at 1268–69. The police found the vehicle matching the one in the surveillance footage that was registered to Griffith's mother, who confirmed that Griffith had been the vehicle's principal user. *Id.* at 1269. During much of the year-long investigation, Griffith had been incarcerated on unrelated charges. *Id.* Detectives obtained recordings of Griffith's jailhouse phone calls made on the day they interviewed Griffith's mother. *Id.* One of the phone calls was made to another suspect in the shooting, and the suspects briefly referenced a car. *Id.* In another

16

phone call, one of Griffith's fellow gang members advised Griffith that the police had been investigating the car. *Id.* After Griffith was released from confinement, he moved into an apartment with his girlfriend. *Id.*

> The affidavit supporting the search warrant stated:
>
> Based upon your affiant's professional training and experience and your affiant's work with other veteran police officers and detectives, I know that gang/crew members involved in criminal activity maintain regular contact with each other, even when they are arrested or incarcerated, and that they often stay advised and share intelligence about their activities through cell phones and other electronic communication devices and the Internet, to include Facebook, Twitter and E-mail accounts.
>
> Based upon the aforementioned facts and circumstances, and your affiant's experience and training, there is probable cause to believe that secreted inside of [Lewis's apartment] is evidence relating to the homicide discussed above.

The affidavit concluded by enumerating the items sought to be seized from the apartment, principally any cell phones and electronic devices found there. *Id.*

The application for the search warrant was granted and executed. *Id.* at 1269–70. When the officers knocked on the door and announced that they had a search warrant, an officer assigned to the premises observed an arm throw an object, which was determined to be a firearm, out the apartment's window. *Id.* at 1270. The government charged Griffith with possession of a firearm by a convicted felon. *Id.*

Griffith challenged the warrant as facially invalid, arguing that there was no evidence he had ever owned a cell phone or other electronic device or that any such device would be found in the apartment. *Id.* The government's argument in support

17

of probable cause to search the apartment rested on the prospect of finding a specific item: a cell phone owned by Griffith. *Id.* The affidavit, however, provided virtually no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the apartment. *Id.* There was no observation of Griffith using a cell phone, no information about anyone having received a cell phone call or text message from him, no record of officers having recovered any cell phone in his possession at the time of his previous arrest and confinement on unrelated charges, and no indication otherwise of his ownership of a cell phone at any time. The court concluded that there was no probable cause to support the search warrant. *Id.* at 1272.

The court also held that the warrant was invalid because it was overbroad, permitting the seizure of all electronic devices found in the residence. *Id.* at 1275. The warrant broadly authorized the seizure of all cell phones and electronic devices without regard to ownership. *Id.* at 1276. That expansive sweep far outstripped the police's proffered justification for entering the apartment—to recover any devices owned by Griffith. *Id.*

Cook's reliance on *Griffith* is misplaced. The affidavit in this case described the alleged crimes involving Woodfill's use of Cook's $75,000 retainer check and stated that evidence of Woodfill's crimes would be found in Cook's files. The warrant was specific in that it narrowly permitted the seizure of Cook's files. The warrant did not permit the seizure of client files whose payments were not identified as being used to cover other expenses not related to those clients. Cook's $75,000

retainer check was identified as being used to cover payments not related to Cook's divorce case.

We conclude that the search warrant was not overly broad.

## II. Privileged Information

While we hold that the search warrant for Cook's files was not overly broad, Cook, nonetheless, is the owner of the files seized from the Firm's office.

Confidential communications between client and counsel made to facilitate legal services are generally insulated from disclosure. Tex. R. Evid. 503(b). The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *United States v. Zolin*, 491 U.S. 554, 562 (1989). The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). As stated above, the attorney-client privilege is personal to the client, and the right to waive the privilege belongs solely to the client. *Bailey*, 507 S.W.3d at 745; *Carmona*, 941 S.W.2d at 953.

"The primary purpose of the work product rule is to shelter the mental processes, conclusions, and legal theories of the attorney, providing a privileged area within which the lawyer can analyze and prepare his or her case." *In re Bexar Cty. Crim. Dist. Attorney's Office*, 224 S.W.3d 182, 186 (Tex. 2007) (orig. proceeding) (citations omitted). The work product privilege is broader than the attorney-client privilege because it includes all communications made in preparation for trial,

19

including an attorney's interviews with parties and non-party witnesses. *Id.* Cook has the right to assert the work product privilege to prevent discovery of the attorney's work product. *See* Tex. R. Civ. P. 192.5(b); *E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 221–22. The HCDA's Office agrees that Cook has a right to assert her attorney-client and work product privileges to her files.

As observed, Cook owns the contents of her file. *McCann*, 422 S.W.3d at 705. Cook also has a legitimate expectation of privacy in her files. *See DeMassa v. Nunez*, 770 F.2d 1505, 1506 (9th Cir. 1985) (holding that clients of an attorney maintain a legitimate expectation of privacy in their client files). Her expectation of privacy in her files has "roots in federal and state statutory and common law and in the United States Constitution, among other sources." *See id.* at 1507. However, Cook's right to her privacy and her property must be balanced against the HCDA's Office's interest in conducting a criminal investigation.

The use of taint teams has been approved and authorized by courts. *See In re Search of 5444 Westheimer Rd. Ste. 1570*, Misc. Action No. H-06-238, 2006 WL 1881370, at *3 (S.D. Tex. July 6, 2006). The courts base decisions permitting the use of taint teams on "the expectation and presumption that the Government's privilege team and the trial prosecutors will conduct themselves with integrity." *United States v. Grant*, No. 04CR207BSJ, 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004).

The trial court provided a specific and detailed procedure to protect Cook's attorney-client privilege. Cook and her attorney, John J. Durrschmidt, who is representing Cook in the underlying proceeding to recover her files, and the taint

20

team will go through the documents. Cook and Durrschmidt will identify the documents they believe are privileged. If the taint team disagrees about which documents Cook claims are privileged, the disputed documents will be submitted for in camera review. Until further order of the court, the taint team is not permitted to discuss the contents of Cook's files with other members of the HCDA's Office or law enforcement.[2]

The trial court's ruling does not cover material subject to the attorney work product privilege. The HCDA's Office recognizes that material subject to the work product privilege should be part of the process and subject to in camera review by the trial court. The trial court had a ministerial duty to include documents subject to the work product privilege within the scope of the review process.

When Cook sought mandamus relief in this court, Cook, Durrschmidt, and the taint team had not started reviewing Cook's files, and we issued an order staying the commencement of the review process. Thus, at this point, the parties have not decided what materials are privileged, not privileged, or disputed and require an in camera review by the trial court. Therefore, Cook's request for relief as to privileged documents is premature. When the review process starts, Cook will have an opportunity to identify the documents she believes are protected by the attorney-client and work product privileges and seek a hearing before the trial court on disputed documents.

---

[2] The trial court signed a written order on August 22, 2019, and orally supplemented that order during a hearing on August 23, 2019.

## III. Crime Fraud Exception

Cook also asserts that the HCDA's Office has not shown a factual basis for applying the crime fraud exception to her privileged documents. The purpose of the crime fraud exception to the attorney-client privilege is "to assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Zolin*, 491 U.S. at 563 (internal quotation marks and citations omitted). Before the trial court conducts an in camera review upon the assertion of the crime fraud exception, the party seeking the privileged material must show a factual basis adequate to support a good faith belief by a reasonable person that an in camera review of the material may reveal evidence to establish the claim that the crime fraud exception applies. *Id.* at 572 (quotations marks and citation omitted).

Cook states that the HCDA's Office has acknowledged that (1) Cook is not seeking to further a future fraud or crime; and (2) no such allegation is being lodged against her. Any assertion by Cook that the HCDA's Office is not entitled to her privileged documents through the crime fraud exception is premature because the review process has not commenced and the HCDA's Office does not appear to have raised the crime fraud exception to Cook's privileges.

## CONCLUSION

We hold that the search warrant is not overly broad, and we deny mandamus relief insofar as Cook seeks immediate return of all her files. However, we conclude that the trial court abused its discretion by its August 23, 2019 oral ruling that Cook

does not have standing to challenge the search warrant and assert her attorney-client and work product privileges.

We also conclude that the trial court abused its discretion by not including work product materials as part of the taint team procedures in the August 22, 2019 written order. We conditionally grant the petition for writ of mandamus, in part, and direct the trial court to modify the order so that paragraphs 7 and 8 of the order apply to both attorney-client privileged materials and work product.

We further conditionally grant the petition, in part, to clarify that, after the review process, the HCDA's Office: (1) must expeditiously return to Cook those documents the parties agree are covered by the attorney-client and work product privileges; (2) may retain copies of documents necessary to prosecute the alleged offenses committed by Woodfill and that the parties agree are not privileged but must promptly return the original nonprivileged documents to Cook; and (3) must return all disputed documents on which the trial court rules in Cook's favor.

We deny all other requests for relief at this time without prejudice to refiling should the trial court rule against Cook on her assertions of privilege. We lift the stay entered on September 17, 2019.


/s/     Frances Bourliot
           Justice


Panel consists of Justices Jewell, Zimmerer, and Bourliot.
Publish — Tex. R. App. P. 47.2(b).

23