*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOSHUA MICHAEL BAUMAN,

Defendant-Appellant.

UNPUBLISHED
May 18, 2023

No. 357186
St. Clair Circuit Court
LC No. 18-002223-FC

Before: PATEL, P.J., and CAVANAGH and REDFORD, JJ.

PER CURIAM.

During the early morning hours of August 24, 2018, defendant broke into the apartment of his then-wife, Ashly Reifert;[1] shot and killed Reifert's boyfriend, Joel Wood; and shot, but did not fatally wound, Reifert and her neighbor, Timothy Fuester. At trial, defendant's theory was he was depressed and took too much Xanax on the day of the shootings, which resulted in him being legally insane. The jury rejected his defense theory, and defendant was convicted of first-degree murder, MCL 750.316(1); two counts of assault with intent to commit murder (AWIM), MCL 750.83; first-degree home invasion, MCL 750.110a(2); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to life imprisonment without parole for his first-degree murder conviction, 18 to 55 years' imprisonment for each of his AWIM convictions, 7 to 20 years' imprisonment for his first-degree home invasion conviction, and two years' imprisonment for his felony-firearm conviction.

Defendant contends he is entitled to a new trial because (a) the jury was improperly instructed it did not have to reach a unanimous verdict regarding whether defendant committed first-degree premeditated murder or first-degree felony murder and trial counsel was ineffective for failing to object to the error; (b) trial counsel was ineffective for failing to move to suppress

---

[1] At the time the crimes were committed, Reifert's last name was Bauman, which was her married name. She restored her maiden name, Reifert, after finalizing her divorce from defendant. For the sake of clarity and consistency, we will only use Reifert's current last name.

defendant's statements to police under *Miranda*;[2] (c) trial counsel was ineffective for failing to move to suppress evidence from defendant's cell phone because the warrant was insufficient; and (d) these cumulative errors resulted in a violation of defendant's right to a fair trial. Finding no error warranting reversal, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant and Reifert began having marital issues in 2017. At about the same time, Reifert began having an affair with Wood. Defendant and Reifert briefly attempted to repair their relationship in 2017, but Reifert filed for divorce in May 2018. Reifert moved out and into her own apartment in June 2018. Defendant expressed belief there was still an opportunity Reifert would forgo the divorce and they would rekindle their relationship. He tried to remain affectionate with Reifert, and consistently contacted her via cell phone calls and text messages. Because Reifert feared defendant, she attempted to be kind, but always rebuffed the advances. Defendant also attempted to control Reifert by various means. Eventually, defendant began to suspect Reifert was seeing another man. She denied it, despite dating Wood. Reifert testified she believed defendant would have killed her if he found out she was dating another man. Defendant admitted that he rang Reifert's doorbell late at night on at least one occasion because he wanted to know who was at the apartment with Reifert. In August 2018, defendant purchased a tracking device and attached it to Reifert's vehicle. He also searched the Internet for covert ways to break into an apartment with an electronic keypad lock, such as Reifert's. Defendant eventually discovered that Reifert was dating Wood. Defendant sent a text message to a friend specifically identifying Wood as the man Reifert was dating. About the same time, defendant purchased an Alcatel brand cell phone, which he only used to call Wood from a number not traceable to defendant.

On August 23, 2018, Reifert and Wood went on a date to a comedy show and then to dinner at an Applebee's restaurant. Defendant followed their path on the tracking device. When he got out of work at about 11:00 p.m., defendant went to the restaurant. But defendant did not confront them in the restaurant or in the parking lot. Instead, defendant drove back home, changed into running shoes, and again checked the tracking device. It showed that Reifert was back at her apartment. Defendant retrieved his .38-caliber Taurus handgun and ammunition. The weapon was a gift to defendant from Reifert. He drove to Reifert's apartment, parked about a block away, and approached the building on foot in the early morning hours of August 24, 2018. Reifert and Wood were engaged intimately at the time. Defendant claimed he heard sexual moans from Reifert when he was outside of the building. Defendant said after hearing those sounds he loaded the murder weapon. Defendant then kicked in the door to Reifert's apartment. Reifert and Wood heard the bang from the door being kicked in and got out of bed. Defendant went directly to the bedroom, saw Reifert and Wood naked, and shot Wood in the chest. Wood rushed defendant and wrestled for the gun. Reifert tried to stop defendant, but eventually ran outside. Wood was shot two more times in the bedroom, one of which struck his spine and caused him to collapse. Defendant then reloaded his handgun in the bedroom, shot Wood once more in the back of the head, and then walked out of the apartment.

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966)

While outside, Reifert attempted to get help from her neighbor, Fuester. Before she could successfully do that, though, she was spotted by defendant. As she ran from defendant around the building, Reifert noted Fuester was standing outside of his door, having been awoken by Reifert ringing his doorbell. As Reifert ran towards Fuester's door, she asked him for help. Defendant came around the corner with his gun. Fuester, who also was carrying a gun, fired a warning shot away from defendant, hoping to scare him off. Defendant continued his approach, firing his gun three times. Reifert was struck twice, one of which entered her chest cavity and punctured her lung. Fuester was shot in his thigh, just above his knee. Defendant fled the scene, and Fuester called 911.

After making sure he avoided being spotted by emergency personnel responding to the crime scene, defendant drove off. He withdrew funds from an automated teller machine (ATM) and drove to Detroit, Michigan. Defendant also posted on Facebook, hinting he had killed the man who was sleeping with his wife. Defendant contacted several people, including his mother, and confessed to killing Wood. Eventually, defendant called 911, which connected to the Detroit dispatch. During a more-than-three-hour telephone conversation with police, defendant admitted he killed Wood and expressed several times that he was considering suicide. The police convinced defendant to turn himself in. Defendant claimed he was on his way to the police station when he stopped for gas, was identified by officers, and was arrested. During the car ride to the jail, defendant made incriminating statements to the officers in the patrol car. When he got to jail, defendant waived his rights under *Miranda* and made similar incriminating statements to Sergeant Steve Surman.

Defendant was charged with the crimes of which he ultimately was convicted. The felony information indicated defendant was being charged with first-degree premeditated murder *or* first-degree felony murder. The underlying felony for the felony murder charge was first-degree home invasion. Before trial, defendant notified the prosecution of his intent to seek an insanity defense. Defendant also moved to suppress his statements to police, arguing he was too impaired from his use of Xanax, a drug he was prescribed for anxiety, to make a voluntary confession. The trial court disagreed and denied the motion. At trial, defendant supported his claim of insanity with his own testimony and that of a psychiatrist. Pertinently, defendant's theory was he was depressed as a result of his marriage ending and took too much Xanax on the day of the shootings, which resulted in him being legally insane.

The trial court instructed the jury it had to unanimously determine if defendant was guilty of first-degree murder, but it was silent on whether the jury was required to unanimously agree whether defendant committed first-degree felony murder or first-degree premeditated murder. The jury, after brief deliberations, returned a verdict of guilty as charged of all the crimes. This appeal followed. While it was pending, defendant moved the trial court for a new trial or a *Ginther*[3] hearing on the basis of the same arguments now raised in this appeal. The trial court denied the motion. The case is now before us for plenary review.

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## II. JURY INSTRUCTIONS

Defendant contends he is entitled to a new trial because the jury was not properly instructed to reach a unanimous verdict regarding whether defendant committed first-degree premeditated murder or first-degree felony murder. We disagree.

Defendant's substantive challenge to the jury instructions and the verdict form has been waived by trial counsel's express approval of them. A claim regarding jury instructions is preserved "by challenging [that] aspect of the jury instructions in the trial court." *People v Czuprynski*, 325 Mich App 449, 466; 926 NW2d 282 (2018). Defendant objected to two jury instruction issues, but neither of them related to how the jury-verdict form listed first-degree murder nor the trial court's unanimity instruction. After the trial court read the instructions, trial counsel stated the defense had no objections to the instructions as given. Because defendant did not object to the issue now challenged on appeal, it is unpreserved. *Id.* Indeed, as argued by the prosecution, considering trial counsel's express approval of the jury instructions as given, we find the general challenge to the jury-verdict form and instructions waived. See *People v Kowalski*, 489 Mich 488, 503-504; 803 NW2d 200 (2011) ("When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver.") Nevertheless, because defendant also argues trial counsel was ineffective for failing to raise an objection to the jury-verdict form and instructions, the merits of his argument will be considered in that context below.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends he is entitled to reversal of his convictions and a new trial because trial counsel's representation was constitutionally defective. We disagree.

### A. STANDARDS OF REVIEW AND PRINCIPLES OF LAW

Claims of ineffective assistance of counsel present mixed questions of fact and constitutional law. *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). We review factual findings, if any, for clear error, while the constitutional issue is reviewed de novo. *Id.* "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id.* When, as in this case, an evidentiary hearing has not been held, our review is limited to mistakes apparent from the record. *People v Thorne*, 322 Mich App 340, 347; 912 NW2d 560 (2017). Additionally, a trial court's decision on a motion for a new trial is reviewed for an abuse of discretion. *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *Id.*

The Sixth Amendment of the United States Constitution guarantees criminal defendants receive effective assistance of counsel. *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984) "To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (cleaned up). "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court presumes counsel was effective, and a defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539. We will not find trial counsel to be ineffective where an objection would have been meritless or futile, *Head*, 323 Mich App at 539, nor will we second-guess matters of trial strategy or "assess counsel's competence with the benefit of hindsight." *People v Abcumby-Blair*, 335 Mich App 210, 237; 966 NW2d 437 (2020) (cleaned up).

## B. JURY INSTRUCTIONS AND VERDICT FORM

Defendant argues trial counsel was ineffective for failing to object to the trial court's unanimity instruction and use of a faulty verdict form. To determine whether trial counsel's representation fell below an objective standard of reasonableness, we must first determine whether an objection to the verdict form or jury instructions would have been granted. This requires consideration of whether the form and instructions were faulty.

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Mills*, 450 Mich 61, 80; 537 NW2d 909 (1995). Further, the right to a trial by jury enshrined in the Sixth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, "includes a requirement that the verdict should be unanimous." *Ramos v Louisiana*, 590 US ___, ___; 140 S Ct 1390, 1396-1397; 206 L Ed 2d 583 (2020). Similarly, "[c]riminal defendants are guaranteed a unanimous jury verdict under the state constitution." *People v Gadomski*, 232 Mich App 24, 30; 592 NW2d 75 (1998), citing Const 1963, art 1, § 14. "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). While a general instruction on unanimity is often sufficient to fulfill this duty, "when the state offers evidence of multiple acts by a defendant, each of which would satisfy the *actus reus* element of a single charged offense, the trial court is required to instruct the jury that it must unanimously agree on the same specific act if the acts are materially distinct or if there is reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt." *Id*. at 512; 530. "The critical inquiry is whether either party has presented evidence that materially distinguishes any of the alleged multiple acts from the others." *Id*. at 512. A general unanimity instruction is not adequate where one party "has offered materially distinct proofs regarding one of the alternatives . . . ." *Id*. at 524.

In this case, defendant was charged and convicted under MCL 750.316(1), which states, in relevant part:

> (1) . . . a person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole:
>
> > (a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.
> >
> > (b) Murder committed in the perpetration of, or attempt to perpetrate . . . home invasion in the first or second degree . . . .

Michigan appellate courts commonly refer to MCL 750.316(1)(a) as first-degree premeditated murder, and MCL 750.316(1)(b) as first-degree felony murder. As explained by our Supreme

Court, the elements of first-degree premeditated murder "are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (cleaned up). And our Supreme Court has explained that felony murder requires the following elements to be established:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute . . . .] [*People v Reichard*, 505 Mich 81, 87 n 11; 949 NW2d 64 (2020) (cleaned up).

The trial court provided a general unanimity instruction, explaining that the jurors must unanimously agree defendant committed "First Degree Murder," before convicting him of such. The trial court was silent on whether the jury had to be unanimous about whether it was first-degree felony murder or first-degree premeditated murder. The jury marked the jury-verdict form next to the statement: "We, the jury, find the **Defendant, JOSHUA MICHAEL BAUMAN, Guilty As Charged** of First Degree Premeditated and/or Felony Murder." Defendant contends the jury should have been instructed to provide a unanimous verdict with respect to first-degree felony murder or first-degree premeditated murder.

In *People v Fullwood*, 51 Mich App 476, 481-482; 215 NW2d 594 (1974), this Court upheld defendant's conviction of murder in the first degree, even though the jury's verdict did not specify whether it was first-degree felony murder or first-degree premeditated murder, explaining:

> The penalty for felony and premeditated murder, both species of first-degree murder, is the same. Substantially similar evidence proves both crimes, except that a showing of murder in the perpetration of an enumerated felony supplies the premeditation element which the prosecution must otherwise prove. Further, the charged counts are not mutually exclusive; they can and do arise in the same transaction.

> Because sufficient evidence exists to support a conviction under either count, the trial court did not abuse its discretion in denying [the] defendant's motion for new trial.

Similarly, in *People v Embree*, 70 Mich App 382, 384; 246 NW2d 6 (1976), this Court concluded that a jury does not have to choose between first-degree premeditated murder and first-degree felony murder where "the evidence of felony and premeditation are present in abundance[.]" And in *People v Smielewski*, 235 Mich App 196, 206; 596 NW2d 636 (1999), this Court determined that error only occurs "when a jury is instructed with regard to two theories of guilt, but charged that it need not unanimously agree on a single theory in order to convict," and "the evidence was also insufficient to justify the submission of one of the two theories to the jury." This Court has ruled: "By providing felony murder and premeditated murder as alternative theories of proving first-degree murder, our Legislature authorized two mental states as alternative means of proving the same crime." *People v Bigelow*, 225 Mich App 806, 807; 571 NW2d 520 (1997) (*Bigelow I*). "We also stated that these two mental states were 'alternative means of satisfying the *mens rea*

element of the single crime of first-degree murder.' " *People v Fredell*, 340 Mich App 221, 245; 985 NW2d 837 (2022), quoting *Bigelow I*, 225 Mich App at 807. In so deciding, this Court referenced "MCL 750.316(1)(a) and (b), which generally provide that both premeditated murder and felony murder constitute first-degree murder." *Fredell*, 340 Mich App at 246 n 8.

We find that the court was not required to give a specific unanimity instruction because there was sufficient evidence to establish both first-degree premeditated murder and felony murder, the charges were proved by substantially the same evidence, and there was no evidence of juror confusion. Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support that defendant was Wood's murderer. There was abundant evidence supporting both premeditation[4] and that he killed Wood during the commission of first-degree home invasion.[5] In fact, defendant effectively admitted he committed first-degree home invasion, but sought to excuse his murder of Wood based on insanity or acting in the heat of passion. Undoubtedly, for the same reasons there was abundant evidence to prove premeditation, the jury was well-supported in disregarding defendant's insanity theory. Consequently, even if trial counsel had objected to the verdict form and requested a specific unanimity instruction, his request would have been denied. We will not find trial counsel to be ineffective where an objection would have been meritless or futile. *Head*, 323 Mich App at 539. We find that trial counsel's performance did not fall below an objective standard of reasonableness as related to the jury instructions.

## C. SUPPRESSION OF STATEMENTS TO POLICE

Defendant next argues trial counsel should have moved to suppress his incriminating statements to police because he was not provided his *Miranda* rights before being subjected to custodial interrogation in the patrol car. To determine whether trial counsel's representation of defendant was constitutionally ineffective, we must first decide whether the motion to suppress would have been granted.

"The Fifth Amendment of the United States Constitution provides that '[n]o person shall . . . be compelled in any criminal case to be a witness against himself . . . .'" *People v White*, 493 Mich 187, 193; 828 NW2d 329 (2013), quoting US Const, Am V, citing Const 1963, art 1, § 17. "In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against

---

[4] To "premeditate" is to "think about beforehand" and to "deliberate" is to "measure and evaluate the major facets of a choice or problem." *People v Bass*, 317 Mich App 241, 266; 893 NW2d 140 (2016) (cleaned up). Premeditation "may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *People v Oros*, 502 Mich 229, 242; 917 NW2d 559 (2018) (cleaned up). In this case, there was evidence that defendant tracked Reifert's location, followed her to Applebee's, went home and changed shoes, tracked that Reifert and Wood were back at Reifert's apartment, retrieved his gun and ammunition from inside the house, and drove to Reifert's apartment before shooting Wood in the chest and head.

[5] There was evidence that defendant kicked in the door to Reifert's apartment and entered without her permission while she was present inside.

compelled self-incrimination requires that the accused be given a series of warnings before being subjected to 'custodial interrogation.' " *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). The Court in *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), clarified: "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." "If the custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused's criminal trial." *Elliott*, 494 Mich at 301, citing *Miranda*, 384 US at 444-445.

Typically, "[c]ustodial interrogation occurs 'during "incommunicado interrogation of individuals in a police-dominated atmosphere." ' " *Elliott*, 494 Mich at 305, quoting *Illinois v Perkins*, 496 US 292, 296; 110 S Ct 2394; 110 L Ed 2d 243 (1990), quoting *Miranda*, 384 US at 445. As explained by the United States Supreme Court, "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v Innis*, 446 US 291, 300; 100 S Ct 1682; 64 L Ed 2d 297 (1980). Stated differently, *Miranda* only applies when a defendant makes incriminating statements while in custody and being interrogated. *Innis*, 446 US at 300.

Defendant's argument in this case relies on a violation of *Miranda* occurring when defendant was being transported to the St. Clair County Jail in a patrol car with Trooper Mark Pheeney and his partner. There is no dispute defendant was in custody while being transported to the jail, and that the officers in the car did not read defendant his rights under *Miranda* at any time. Thus, the only relevant concern is whether defendant was being interrogated in the patrol car. *Innis*, 446 US at 300.

" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 US at 300. When considering "whether statements or questions posed by police to a defendant constitute an interrogation, the dispositive question is whether the suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *People v McDonald*, 303 Mich App 424, 438; 844 NW2d 168 (2013) (cleaned up). For a more specific discussion of the issue, our Supreme Court in *White*, 493 Mich 195, stated:

> In *Innis*, 446 US at 300-302 the United States Supreme Court explained the circumstances under which a defendant is deemed to have been subjected to "interrogation":
>
> > [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects

the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that *they should have known* were reasonably likely to elicit an incriminating response.

Our Supreme Court explained that an officer's remarks should constitute "interrogation" " 'if an objective observer (with the same knowledge of the suspect as the police officer) would, on the sole basis of hearing the officer's remarks, infer that the remarks were designed to elicit an incriminating response[.]' " *White*, 493 Mich at 196, quoting 2 LaFave, Criminal Procedure (3d ed), § 6.7(a), p 757.

In this case, defendant claims he was interrogated in the patrol car while being transported to jail. We have reviewed the squad car video in its entirety and find no indication defendant was subjected to interrogation.[6] As the video begins, it is clear Trooper Pheeney and his partner have never been to St. Clair County Jail, so before leaving the gas station, defendant provided them the address and directions. After about four minutes of driving in silence, it sounds as though defendant initiates conversation about Port Huron. About 30 seconds later, the conversation turns to defendant's car. It sounds as though defendant asked if his car would be towed to Roseville or Port Huron, and informed the officers his mother lived in Roseville. Over the next four minutes, there was some intermittent chatter, but it is not possible to understand what is being said. Defendant then reinitiated conversation, mentioning the traffic conditions. This led to a discussion of the roads defendant took to get to work, where defendant worked, and what type of work he did. Defendant told the officers he worked afternoon shifts, which were difficult on him because he had two children. One of the officers asked defendant how old his children were, and defendant answered. They briefly discussed school, preschool, and daycare.

About 20 seconds later, an officer asked defendant where his kids were at the moment. Defendant said he was unsure where Reifert took FB, their daughter, but FB was not at Reifert's apartment. An officer asked another question, which is difficult to hear, and defendant responded by explaining Reifert went out for the night and likely took FB somewhere but he did not know where. Defendant did know, though, that FB was not at Reifert's when the events leading to his arrest occurred. One of the officers asked for clarification if FB was at the apartment "tonight," and defendant said she was not. About one minute of silence follows that interaction.

An officer then commented about the traffic and chuckled, then followed up with asking defendant if Reifert was home. Defendant responded by saying Reifert being home was kind of how everything happened. Defendant then explained the situation to the police officers without

---

[6] The ambient noise caused by driving on the freeway makes several segments of the video difficult to hear.

any intervening questions. Pertinently, defendant told them Reifert worked for the Port Huron Police Department, she and defendant were separated, but he thought Reifert was leading him on about whether they would get back together. Defendant said Reifert started going out with another man, who the officers might know, "I think his name is Joel Wood." Defendant explained they might know Wood because defendant was pretty sure Wood was a police officer. Defendant stated he had a gut feeling Reifert was out with another man, so he went to her apartment and knocked on the door. When there was no answer, he walked around to the back of the building. While back there, he heard Reifert and Wood having sex. Defendant said he then kicked in the door to the apartment and shot Wood.

During a pause in the story, an officer began speaking again. What exactly the officer says is unclear, but it ends with an attempt at commiseration, stating it must have been difficult to come upon Reifert in that situation. Defendant explained the real problem was all of the mixed messages from Reifert because defendant was still trying to fix the relationship while she was lying about seeing other men. Defendant said that, after he heard them engaging in sexual intercourse, he just "flipped out." Over the next several minutes, an officer asked defendant what Reifert did for the Port Huron Police, what Wood did for the same department, and where the mother of defendant's other child lived. Defendant answered the questions and intermittently helped with directions to the St. Clair County Jail.

Defendant then told the officers he just drove around after shooting Wood. He knew he had messed up and was not sure what he wanted to do. Defendant stated he called 911 and talked to the operators for several hours and eventually agreed to turn himself in, but was arrested at the gas station before he could do so. Defendant expressed concern about returning to the Port Huron area because he figured he would be treated poorly considering Wood and Reifert worked for the police. A few minutes later, one of the officers asked how long defendant had been awake and whether he worked the previous day. Defendant said he had been up since 8:00 a.m. on August 23, 2018, worked a full day, went home, and then went to Reifert's apartment after having a gut feeling she was with a man. During the next five minutes, defendant and the officers engaged in idle chatter about where the officers worked, when their shifts ended, and that this was defendant's first marriage.

Defendant then complained to the officers about Reifert spending too much money and accruing debt, which caused him to work more hours. Reifert then blamed his working too much as a reason for ending the marriage. An officer stated it must be a frustrating situation. Defendant eventually stated he just wished Reifert talked to him more. Defendant engaged the police officers in a conversation about religion, and questioned whether someone who did something bad could go to heaven if they believed in God. An officer agreed to being religious and said he did not judge defendant. Over the next five minutes, the passengers again discussed defendant's work, what he did there, and directions to the jail. Defendant then raised the issue of religion a second time, and specifically asked if they thought someone who killed another person could go to heaven. The officers stated they thought such could happen if the person truly believed in God and asked for forgiveness. During the following seven minutes of the drive, defendant and the police officers engaged in general conversation and talked about getting directions to the jail. Eventually, they arrived at the jail. Before getting out of the car, defendant thanked the officers for being good to him during the drive.

The relevant question is whether, at any point during the conversation, the officers interrogated defendant. In other words, " 'the dispositive question is whether the suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.' " *McDonald*, 303 Mich App at 438, quoting *White*, 493 Mich at 208 (cleaned up). After getting directions to the jail and beginning the drive, the conversation between defendant and the officers was started by defendant. The conversation primarily stayed within the realm of small-talk, including discussions about work, traffic, and children. When discussing work shifts, defendant brought up that the afternoon shift was difficult because he had children. This statement guided the conversation to defendant's children, who were young, and the police officer asked where they were. Defendant responded by stating he was not sure where FB was, but he knew she was not at the apartment when the events at issue occurred. Shortly after, an officer asked if defendant's wife was home. Defendant responded to that question by jumping into the entire story of what occurred leading up to and including the shooting of Wood. All of the questions for the remainder of the car ride were about idle topics and did not lead to incriminating statements. Defendant brought up religion himself, and asked about going to heaven after a person kills someone else.

The only two questions asked by officers that led to any incriminating statements from defendant were asking where his children were, and asking if his wife was home. These questions arose after an otherwise uneventful conversation rife with small-talk. Questions about a person's family are naturally related to such small-talk. Indeed, it was defendant who brought up his children, unprompted, when speaking about his afternoon work shift. The officer who asked where his children were did not have reason to know such a question would elicit an incriminating response. *McDonald*, 303 Mich App at 438. Instead, the officer had every reason to believe the conversation would continue in the same arena—small-talk during a long car ride. The next question related to whether defendant's wife was home. Once again, a question about a family member is more indicative of additional small-talk than it is a form of interrogation. In fact, up until that point, defendant had not given the officers any information that Reifert was involved in the crime in any manner. Further, given the entire context of the car ride, the police officers did not ask typical interrogation questions; they asked about work, family, traffic, and directions to the jail.

When knowing all the facts of the crimes defendant committed, it might seem plausible the question about whether Reifert was home was an attempt to have defendant speak about the shootings, but doing so would ignore the other 59 minutes of the car ride. This is an important distinction, because the United States Supreme Court stated that, when determining whether a police action is likely to elicit an incriminating response, the inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 US at 301. When the officers inquired whether Reifert was home, the officers were carrying on as they had for the entire car ride by asking about topics related to small-talk. Defendant's decision to use that question to push the conversation into an incriminating response was his own voluntary decision. Because "the police . . . cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id*. at 301-302.

The record strongly suggests that defendant had a significant desire to speak about the shootings. Before being arrested, defendant called 911 and talked to multiple officers for several hours about the events leading to the crimes. At other points during the transport, defendant took innocuous questions, such as when he woke up the day before, and used them as a guise to steer the conversation back to the shootings. Lastly, defendant thanked the officers for the enjoyable car ride before exiting the patrol vehicle, which indicated he did not perceive he was being interrogated during the drive.

Because there was no indication from the record that the police officers should have known any question was "reasonably likely to elicit an incriminating response," we conclude that defendant was not interrogated within the meaning of *Miranda* while being driven to the St. Clair County Jail. *Id.* Consequently, because there was no violation of *Miranda*, a motion to suppress defendant's statements to police on that ground would have been denied by the trial court. *Elliott*, 494 Mich at 301. Considering the motion to suppress would have been denied as meritless, trial counsel cannot be deemed ineffective for failing to raise the argument. *Head*, 323 Mich App at 539.

Defendant further argues his trial counsel should have moved to suppress the statements he made to Sergeant Surman while in jail. Our conclusion that *Miranda* is inapplicable to the conversations during the car ride to the jail is determinative of this second argument as well. Relying on *United States v Bayer*, 331 US 532, 540-541; 67 S Ct 1394; 91 L Ed 2d 1654 (1947), defendant claims that, once he "let the cat out of the bag" when being subjected to custodial interrogation in the patrol car, there was no reason for him to then stop speaking once he was provided with his rights under *Miranda*. The Supreme Court explained in *Bayer*:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. [*Bayer*, 331 US at 540-541.]

The Court clarified it was discussing whether "making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Id*. at 541.

This "cat out of the bag" theory was discussed at length by the Supreme Court in *Oregon v Elstad*, 470 US 298; 105 S Ct 1285, 84 L Ed 2d 222 (1985). In *Elstad*, the defendant made a statement without being advised of his *Miranda* rights. *Id*. at 301. Approximately one hour later, he executed a full, written confession after he was advised of his *Miranda* rights. *Id*. Although *Miranda* required suppression of the unwarned admission, the *Elstad* Court explained that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made" and held that the subsequent confession was admissible because it was not a consequence of the prior *Miranda* violation. *Id*. at 309, 318. The Court reasoned that even in extreme cases "in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated." *Id*. at 311-312.

In this case, defendant's incriminating statements made in the patrol car on the way to jail were admissible because they were not obtained via custodial interrogation in violation of *Miranda*. Defendant has not provided any ground on which to invalidate the *Miranda* waiver provided by defendant before being interrogated by Sergeant Surman.[7] Because the motion to suppress the statements to police would have been denied as meritless, trial counsel cannot be deemed ineffective for failing to raise the argument. *Head*, 323 Mich App at 539.

## D. SEARCH WARRANT

Defendant also contends trial counsel should have moved to suppress evidence retrieved from his cell phone because the affidavit supporting the warrant to search the cell phone was insufficient. To address whether trial counsel's representation fell below an objective standard of reasonableness, we must first consider whether a motion to suppress from trial counsel would have been granted.

"Both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Pagano*, 507 Mich 26, 31-32; 967 NW2d 590 (2021), citing US Const, Am IV; Const 1963, art 1, § 11. "The lawfulness of a search or seizure depends on its reasonableness." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2020) (quotation marks and citation omitted). "A search occurs under the Fourth Amendment when 'the government violates a subjective expectation of privacy that society recognizes as reasonable.' " *People v Abcumby-Blair*, 335 Mich App 210, 230; 966 NW2d 437 (2020), quoting *Kyllo v United States*, 533 US 27, 31-33, 121 S Ct 2038; 150 L Ed 2d 94 (2001). "Ordinarily, searches or seizures conducted without a warrant are unreasonable per se, and when evidence has been seized in violation of the constitutional prohibition against unreasonable searches and seizures, it must be excluded from trial." *People v Woodard*, 321 Mich App 377, 383; 909 NW2d 299 (2017) (quotation marks and citation omitted).

"Generally, in order for a search executed pursuant to a warrant to be valid, the warrant must be based on probable cause." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). This requirement comes from specific language in the United States and Michigan Constitutions. US Const, Am IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); Const 1963, art 1, § 11 ("No warrant to search any place or to seize any person or things or to access electronic data or electronic communications shall issue without describing them, nor without probable cause, supported by oath or affirmation."). "Probable cause to issue a search warrant exists where there is a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place." *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). Our Supreme Court, in *People v Hughes*, 506

_____

[7] Defendant attempts to invalidate the waiver by citing caselaw related to the amount of time that must pass to allow a fresh set of *Miranda* warnings to insulate the new confession from the tainted one. But this reasoning is not applicable when there is no tainted confession. See *Clewis v Texas*, 386 US 707, 710; 87 S Ct 1338; 18 L Ed 2d 423 (1967).

-13-

Mich 512, 538-539; 958 NW2d 98 (2020) (alterations in original), recently discussed the requirements necessary to obtain a warrant as related to cell phone data:

> The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." US Const, Am IV. A search warrant thus must state with particularity not only the items to be searched and seized, but also the alleged criminal activity justifying the warrant. See *Berger v State of New York*, 388 US 41, 55-56; 87 S Ct 1873; 18 L Ed 2d 1040 (1967); *Andresen v Maryland*, 427 US 463, 479-480; 96 S Ct 2737; 49 L Ed 2d 627 (1976); *United States v Galpin*, 720 F3d 436, 445 (CA 2, 2013) ("[A] warrant must identify the specific offense for which the police have established probable cause."). That is, some context must be supplied by the affidavit and warrant that connects the particularized descriptions of the venue to be searched and the objects to be seized with the criminal behavior that is suspected, for even particularized descriptions will not always speak for themselves in evidencing criminality. See [*Warden, Maryland Penitentiary v*] *Hayden*, 387 US [294,] 307[; 87 S Ct 1642; 18 L Ed 2d 782 (1967)] ("There must, of course, be a nexus . . . between the item to be seized and criminal behavior. Thus . . . , probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required.").

> > The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. [*Maryland v Garrison*, 480 US 79, 84; 107 S Ct 1013; 94 L Ed 2d 72 (1987); see also, e.g., *Horton* [*v California*], 496 US [128], 139[; 110 S Ct 2301; 110 L Ed 2d 112 (1990)].]

Before addressing the specific affidavit and warrant from the present case, it is important to note "[a] magistrate's finding of probable cause and his or her decision to issue a search warrant should be given great deference and only disturbed in limited circumstances." *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017). Therefore, when determining whether a motion to suppress filed by trial counsel would have been successful, we must bear in mind the deference the trial court would have given to the magistrate's decision to issue the search warrant. *Id*. Simply put, the only duty of the trial court, as the reviewing court, "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *People v Keller*, 479 Mich 467, 475; 739 NW2d 505 (2007) (quotation marks, citations, and alterations omitted).

In the present case, Detective Kelsey Wade prepared an affidavit to support her request for a search warrant on August 24, 2018. The proposed warrant was to generally search defendant's car, which was a "2015, dark grey Dodge Dart . . . ." Detective Wade also sought permission to search and seize a multitude of items that could potentially be found inside the car, including weapons, clothing or shoes related to the shootings, and "[a]ny and all electronic devices and/or

-14-

data stored therein or associated thereto." It is undisputed defendant's cell phone fell out of his car when he was arrested. The affidavit specified the search would include:

> the contents of said devices by way of: forensic analysis, to include subscriber information, cellular phone records (incoming, outgoing, and missed), call detail, email messages (incoming and outgoing) and content of such, any [short message service (SMS)] or [multimedia messaging service (MMS)] (incoming and outgoing) and content of those messages, caller identification(s), media including photos and videos, and application information.

To support the request to search those items, Detective Wade averred she was "a Detective with the St. Clair County Sheriff's Office, with over 14 years of law enforcement experience investigating criminal activity." Detective Wade relayed the investigation began after Fuester called 911 and reported he, Reifert, and Reifert's boyfriend had been shot. Detective Wade went to the hospital to speak with Fuester, who reported seeing Reifert being chased by a man Fuester did not know, but described as fitting defendant's physical description, and "wearing a black hooded sweatshirt, and jeans." Fuester told Detective Wade about how he had fired a warning shot to try to scare off Reifert's assailant, but the man still fired his gun three or four times in their direction before running off. Fuester reported he noticed Reifert had been shot and called 911. While on the telephone with the operator, Fuester realized he was shot. Detective Wade averred Fuester told her that Reifert was still able to speak and said her "ex-husband," who was defendant, was the shooter.

Detective Wade also reported she spoke to Reifert while at the hospital. Before doing so, hospital staff told Detective Wade that Reifert had suffered injuries consistent with gunshot wounds. Reifert then told Detective Wade it was defendant, Reifert's estranged husband, who shot her. Reifert informed Detective Wade what happened at her apartment building, which included identifying defendant as the shooter of all three victims. Detective Wade averred she spoke with an officer at the scene of the shooting, who reported obvious signs of forced entry, a significant amount of blood, and Wood's deceased body in the bedroom of Reifert's apartment unit. Wood's injuries were consistent with those caused from gunshots.

Next, Detective Wade referenced defendant's call to the 911 dispatch in Detroit, during which he made "admissions about the shooting, indicating that he 'came into the apartment and found his girlfriend with another man and began shooting.'" Detective Wade averred defendant was found and arrested during the early morning hours of August 24, 2018, and had blood on his shoes and clothing. Defendant had two handguns in his car. During an inventory search, police secured the guns, $500 of cash, a wallet, and an automated teller machine (ATM) card. Detective Wade noted defendant's cell phone was collected from the scene of the arrest. Specifically with respect to the cell phone, Detective Wade averred:

> Through affiant[']s training and experience, cellular phones have cameras capable of capturing photos and videos and storage of the same, phones further store text message detail, call logs or history, contact information, email history, instant message history, and internet browsing history. A search of any device capable of holding digital contents may uncover evidence of communications or documentation and/or location relevant to the death investigation.

Detective Wade ended by stating her belief there was probable cause to search the items identified in the affidavit, which would "reveal further evidence into the investigation of criminal activity," and that "[t]he information contained within this affidavit is of Affiant's personal knowledge and/or knowledge relayed to Affiant by other members of law enforcement." The search warrant was signed by a judge or magistrate on August 24, 2018.

Defendant contends the above factual information was insufficient to establish a nexus between defendant's criminal behavior and the possibility of finding evidence of such on his cell phone. Defendant compares the case to other situations where an officer establishes probable cause a crime was committed, then infers evidence of such crime must be on the accused's cell phone because it is common for such evidence to be there, in the experience of the affiant. This case differs from those for two important reasons. Initially, it is true Detective Wade relied heavily on her experience when averring it was likely there would be evidence of the crimes on defendant's cell phone. But this Court has been clear "that an affiant's representations in a search warrant affidavit that are based upon the affiant's experience can be considered along with all the other facts and circumstances presented to the examining magistrate in determining probable cause." *People v Darwich*, 226 Mich App 635, 639; 575 NW2d 44 (1997). We find that it was not improper for the magistrate to rely on Detective Wade's experience when deciding whether probable cause existed to search defendant's cell phone. *People v Ulman*, 244 Mich App 500, 509; 625 NW2d 429 (2001); *Darwich*, 226 Mich App at 639.

Further, the affidavit in the present case had *specific* facts related to defendant's cell phone. Pertinently, Detective Wade averred defendant's cell phone was collected as evidence when he was arrested. The cell phone was found falling from defendant's lap when he exited the car. Notably, the affidavit also referenced the car contained two handguns, $500 cash, and defendant's bloody clothes and shoes. The averment from Detective Wade that defendant was found with a cell phone specifically belies the assertion by defendant in his brief on appeal that there was a "glaring deficiency in the search warrant affidavit" in the form of its alleged "failure to even conclusively establish [defendant] owned or possessed a cell phone or that one would likely be found on his person, in his car, or in his residence." Thus, to the extent defendant's argument relies on an allegation Detective Wade's affidavit made no reference to defendant's cell phone, such simply is not supported by the record. Given defendant's burden to establish the factual predicate of his claims of ineffective assistance of counsel, this weighs against his arguments. *Head*, 323 Mich App at 539.

The second reason this case does not fit defendant's narrative is the averment regarding defendant calling 911 while in Detroit. Although the affidavit does not specifically state defendant used his cell phone to make the call, such was the only possible inference from the other information provided in the affidavit. And, indeed, caselaw is clear that a magistrate may draw inferences on the basis of the stated facts in the affidavit supporting the request for the search warrant. See *People v Unger*, 278 Mich App 210, 244; 749 NW2d 272 (2008) ("Probable cause to issue a search warrant exists if there is a substantial basis *for inferring* a fair probability that contraband or evidence of a crime exists in the stated place.") (Emphasis added). Detective Wade averred defendant contacted 911 and made certain admissions to the operator. Despite the crime occurring in St. Clair County, defendant connected to the 911 dispatch for Detroit. After making those admissions, defendant was stopped in the metro-Detroit area and arrested. He had his cell phone with him, along with two guns, $500 in cash, and his bloody clothing. From this evidence,

it was reasonable to infer defendant used his cell phone to call 911, during which he made admissions about committing the shootings. Considering defendant used his cell phone to make admissions, and carried his cell phone in the car that also contained two guns, bloody clothing, and $500 in cash, it was reasonable to believe the cell phone was connected to the crimes alleged in the affidavit. *Id*.

We find that the averments in Detective Wade's affidavit created "a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime [would] be found" on defendant's cell phone. *Kazmierczak*, 461 Mich at 417-418. The affidavit sufficiently established " 'a nexus . . . between the item to be seized and criminal behavior.' " *Hughes*, 506 Mich at 538-539, quoting *Hayden*, 387 US at 307. In light of the deference owed by a reviewing court to the magistrate who issued the warrant, along with all of the valid averments and inference discussed above, the trial court undoubtedly would have denied defendant's motion to suppress evidence obtained from his cell phone because of an allegedly faulty warrant. *Franklin*, 500 Mich at 101.[8]

Alternatively, even if we were convinced the warrant was faulty, the motion to suppress evidence from the cell phone still would have been denied under the good-faith exception to the exclusionary rule. Generally, evidence found during an unconstitutional search must be excluded from trial. *Woodard*, 321 Mich App at 383. "The primary benefit of the exclusionary rule is that it deters official misconduct by removing incentives to engage in unreasonable searches and seizures." *People v Goldston*, 470 Mich 523, 529; 682 NW2d 479 (2004). Given the purpose of the exclusionary rule, the United States "Supreme Court adopted a good-faith exception to the exclusionary rule." *Id*. at 528, citing *United States v Leon*, 468 US 897; 104 S Ct 3405; 82 L Ed 2d 677 (1984). "The Court opined that no deterrence occurs when police reasonably rely on a warrant later found to be deficient." *Goldston*, 470 Mich at 530, citing *Leon*, 468 US at 916-919. This exception applies "when a law enforcement officer acts within the scope of, and in objective, good-faith reliance on, a search warrant obtained from a judge or magistrate" *Goldston*, 470 Mich at 530. Our Supreme Court adopted the good-faith exception to the exclusionary rule from *Leon*, 468 US 897, in *Goldston*, 470 Mich at 541. The good-faith exception does not apply, though, when "the affidavit was [] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id*. at 543, citing *Leon*, 468 US at 923.

The affidavit in the present case contained several factual assertions regarding defendant's commission of the shootings, his ownership of a cell phone, the cell phone being found when he was arrested, and allowing for the inference the cell phone was used to call 911 and make a partial

---

[8] We have reviewed the caselaw from foreign jurisdictions cited by defendant, and find they are distinguishable from the present case, along with not being binding. *United States v Lyles*, 910 F3d 787 (CA 4, 2018); *United States v Griffith*, 432 US App DC 234; 867 F3d 1265 (2017); *United States v Brown*, 828 F3d 375 (CA 6, 2016); *Commonwealth v White*, 475 Mass 583; 59 NE3d 369 (2016). Defendant's reliance on these cases is founded on the assumption the affidavit in this case contains no facts connecting his criminal behavior to his cell phone other than an officer's training and experience. This assumption by defendant is incorrect; the affidavit in the present case consists of specific facts creating a nexus between defendant's commission of the shootings and his cell phone.

confession. Importantly, the cell phone was carried by defendant in his car, which also contained two guns, cash, and bloody clothing. Even if there is a minor possibility these facts may not be enough to create probable cause to believe the cell phone contained evidence of the crimes, the affidavit was at least specific enough for the law enforcement officers to believe the warrant was correctly and lawfully issued. *Goldston*, 470 Mich at 543. In other words, "the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id*., citing *Leon*, 468 US at 923. As a result, even if we entertained the idea the warrant was improperly issued, the evidence discovered on defendant's cell phone still would not have been excluded because of application of the good-faith exception to the exclusionary rule. *Goldston*, 470 Mich at 530.

Because the warrant to search defendant's cell phone was constitutionally sound, any motion to suppress evidence obtained from it would have lacked merit. *Kazmierczak*, 461 Mich at 417-418. Alternatively, even if the affidavit supporting the warrant was technically deficient, the motion to suppress still would have been denied on the basis of the good-faith exception to the exclusionary rule. *Goldston*, 470 Mich at 543. Because trial counsel's motion to suppress would have been meritless, he cannot be determined to have provided ineffective assistance of counsel for not bringing the motion. *Head*, 323 Mich App at 539. Consequently, defendant's claim of ineffective assistance of counsel on this ground lacks merit and does not warrant vacating defendant's convictions and providing him a new trial. *Vaughn*, 491 Mich at 669.[9]

## E. CUMULATIVE ERROR

Finally, defendant argues that, even if any of the individual errors above did not cause enough prejudice to warrant reversal and a new trial, the cumulative effect of those errors did so. "To warrant reversal based on cumulative error, 'the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial.' " *Schrauben*, 314 Mich App at 193, quoting *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). "In making this determination, only actual errors are aggregated to determine their cumulative effect." *People v Bahoda*, 448 Mich 261, 292 n 64; 531 NW2d 659 (1995). In other words, "[a]bsent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *People v Green*, 313 Mich App 526, 537; 884 NW2d 838 (2015) (quotation marks and citation omitted;

---

[9] Defendant requests us to remand to the trial court for a *Ginther* hearing based on all his claims of ineffective assistance of counsel. Because there is no factual record that requires development to consider whether defense counsel was ineffective, the trial court did not abuse its discretion when it denied defendant's request for a *Ginther* hearing. *Ginther*, 390 Mich at 443; see also *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007) (holding that a *Ginther* hearing is not warranted where the "defendant has not set forth any additional facts that would require development of a record to determine if defense counsel was ineffective[.]").

alteration in original). Defendant has not identified any actual errors that occurred during the trial. Because of that, "there can be no cumulative effect of errors meriting reversal." *Id.* (quotation marks and citation omitted).

Affirmed.

/s/ Sima G. Patel
/s/ Mark J. Cavanagh
/s/ James Robert Redford